314 Ga. 306
FINAL COPY

S22A0305.  SAMS v. THE STATE.

BETHEL, Justice.

In 2015, a Peach County jury found Tevin Sams guilty of the malice murder of eight-year-old Jai'mel Anderson, the aggravated assault of six-year-old J. A., and other offenses. The charges arose out of an incident in which shots were fired through an apartment door into a room occupied by the two boys. Following the denial of his motion for new trial, Sams challenges the sufficiency of the evidence supporting his convictions and argues that the trial court erred by allowing the State to admit evidence pursuant to OCGA § 24-4-404 (b) that Sams shot at someone else in 2014. We affirm.[1]

---

[1] The crimes occurred on January 6, 2015. On March 6, 2015, a Peach County grand jury indicted Sams, Dennis Eason, Jr., Antonio Garvin, Jeremy Jackson, and Kristian Wipfel for the following counts: making terroristic threats against Dejad Williams (Count 1), malice murder of Jai'mel Anderson (Count 2), felony murder of Jai'mel, predicated on aggravated assault (Count 3), aggravated assault of J. A. (Count 4), and two counts of possession of a firearm during the commission of a felony (Counts 5 and 6). Garvin and Jackson both pled guilty to two counts of aggravated assault. Their cases are

1. The evidence presented at trial showed the following.[2] Sams, Antonio Garvin, Jeremy Jackson, Dennis Eason, Jr., and Kristian Wipfel were acquainted with one another. All five men were together on January 6, 2015.

At trial, Garvin testified to the following. On the night of the shootings, Garvin, Sams, Jackson, Eason, and Wipfel met at Jackson's apartment in Macon. While they were gathered there, Eason talked about a dispute he had with a man named Dejad

---

not part of this appeal. Sams, Eason, and Wipfel were tried together. At their jury trial held from October 31 to November 9, 2016, Sams was found not guilty of Count 1 and guilty of Counts 2 through 6. Eason and Wipfel were found guilty of all counts, except Wipfel was found not guilty as to Count 1; their cases are not part of this appeal. On November 10, the trial court sentenced Sams to serve life in prison without the possibility of parole on Count 2; a term of 20 years on Count 4, to be served concurrently with Count 2; a term of five years on Count 5, to be served consecutively to Count 2; and a term of five years on Count 6, to be served consecutively to Count 5. The trial court purported to merge Count 3 with Count 2, but Count 3 was actually vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993). Sams filed a motion for new trial on December 6, 2016, which he later amended through new counsel. The trial court denied the motion, as amended, on August 26, 2020. Sams filed a timely notice of appeal. This case was docketed in this Court to the term beginning in December 2021 and was submitted for a decision on the briefs.

[2] Because this case requires an assessment of whether an assumed error by the trial court was harmless, we lay out the evidence in some detail and not only in the light most favorable to the jury's verdicts. See *Strong v. State*, 309 Ga. 295, 295 (1) n.2 (845 SE2d 653) (2020).

2

Williams, saying "Dejad owed him money" and that "he ran off with some of his marijuana." The five men decided to travel together to Fort Valley to find Williams. The decision to travel to Fort Valley was a "spur of the moment type deal," and Eason wanted to go to Fort Valley "to get his product or his money back from [Williams]."

Katelyn Grandison, Sams's girlfriend at the time, testified that before traveling to Williams's apartment, Sams got a gun at the apartment that the two of them shared and told her that he was going to get some marijuana and "see a transaction." Grandison asked Sams if he was going to drive his car and believed he responded that "they followed him there, or that they were already outside." When asked who "they" were, Grandison said she assumed Sams was referring to Wipfel and Eason.

Garvin testified that Sams and Wipfel rode with Garvin in his car, and Eason rode with Jackson in Jackson's car to Fort Valley. The two cars went all the way to the back of the Indian Oaks apartment complex where Williams lived and then turned back around. Then, the two cars headed "back over to the church parking

3

lot," and Garvin followed Jackson's car. Before the two cars got to the church, the five men saw Williams outside of the "A apartment complex" with a gun.

Garvin then testified that when the two cars arrived at the church parking lot, everyone got out of the cars and started "asking questions." That is when they found out that Eason had been texting Williams. Eason and Williams had been "going back and forth" over text, and "it went to another level, basically."

Williams testified that at first he thought his cousin (who also lived in the Indian Oaks apartment complex) was sending him the text messages. After receiving multiple text messages, Williams went to his cousin's apartment at 1:17 a.m. but then returned to his apartment. Williams then received more threatening texts when he was back at his apartment. At 1:37 a.m., Eason sent Williams a text saying, "[n]***a we here, and my b***h know where you stay. We will kick yo door in with them kids in there n***a."

Garvin testified that Eason used Garvin's phone to send the text messages to Williams. When the men got out of the cars, Garvin

4

saw that Eason and Sams each had a gun, "but you wouldn't be able to tell if it was on them because of what they were wearing." Eason was wearing "like a bubble jacket," and Sams was wearing a "onesie" which Garvin described as like "an inmate jumpsuit."

Garvin testified that after all five men talked in the church parking lot, Eason and Sams still had their guns, and Eason, Sams, and Wipfel all walked "over through the apartment breezeway." Then Garvin saw Eason walk back toward the cars and heard gunshots as Eason was walking back. The two cars then traveled back to Jackson's apartment. Wipfel told Garvin that Sams shot first through the door and that while Sams was shooting, Wipfel "came back and . . . started shooting." Garvin testified that the gun that Wipfel had was Eason's gun. Sams also told Garvin that he and Wipfel shot into the doorway of the apartment.

Jackson, Garvin's cousin, testified to the following. He first saw Eason with a gun when Garvin, Wipfel, and Eason came to his apartment on New Year's Eve. Eason's gun was "silver and black." The first time Jackson heard about an altercation between Eason

5

and "some other guy" was at Jackson's apartment after he went to Zaxby's in Macon with Garvin and Eason on the night of the shootings. The group decided to travel to Fort Valley after Eason discussed his dispute with Williams, and Jackson thought that "it was just going to be like a fight or something like that."

Jackson further testified that Eason got in his car and that he drove to Fort Valley. Eason directed him where to go when they arrived in Fort Valley. When they arrived at the apartment complex, Jackson drove through the entrance and into the complex, then turned around and came out of the complex. While he was driving out, Jackson testified that Eason said, "that's him over there." They then drove around to the side of the complex and parked "by a shed or a dumpster or something like that." Garvin was driving another car with Wipfel and Sams in it, and when both cars parked, Wipfel and Sams got out of the car and Eason went to talk to them. After talking, Eason went back to the car, and Wipfel and Sams went through "a little opening of the gate or something" toward the apartment complex door. Wipfel and Sams then walked back down

6

toward the cars, and then went back toward the apartment complex again. Jackson said he "heard shots" when Wipfel and Sams "went back up" toward the apartment complex. Then they came back toward the cars, and Wipfel got in Garvin's car and Sams got in Jackson's car. After that, Eason said, "go, go drive," and the five men left to go back to Macon.

Jackson testified that when he heard shots, Eason was sitting next to him in his car, Garvin was in his car, and Wipfel and Sams were not there with them in the cars. Jackson testified that Sams had a jacket on when he got back in Jackson's car. Jackson suggested that Sams was covering a gun inside his jacket, but Jackson did not see Sams's gun until the men got back to Jackson's apartment in Macon.

Williams testified that he was taking care of his girlfriend's children, Jai'mel and J. A., who slept at his apartment every night on an air mattress in the living room. Williams testified that he was in his bedroom when the shots were fired and that he crawled to the living room to retrieve Jai'mel and J. A. from the air mattress where

7

they were sleeping. Williams grabbed J. A. off the mattress first. Williams then grabbed the air mattress and began pulling it to get Jai'mel. He could feel that it had gone flat, and he realized Jai'mel had been shot. It was later determined that — although J. A. had not been struck by a bullet — Jai'mel had been shot twice, once in the leg and once in his upper abdomen, which killed him. Williams called 911, and police officers arrived shortly thereafter. Shell casings from a .40-caliber Glock pistol were found at the crime scene. The police later determined that 16 rounds were fired through Williams's door.

At trial, Sams testified that he was with Wipfel, Eason, Jackson, and Garvin on the night of the murder and that he traveled with them to Fort Valley. After arriving at the Indian Oaks apartments and parking at the church, Sams stated that all five men exited the vehicles. Thereafter, according to Sams, Wipfel and Eason went to the apartments while he, Jackson, and Garvin got back into the cars. Sams further claimed that after hearing gunshots, he saw Wipfel and Eason run back to the cars, and that at that moment he

saw Eason with a gun for the first time. Additionally, Sams testified that, at one time, he owned a .40-caliber Glock.

2. Sams contends that the evidence presented at trial was insufficient to support his convictions. Specifically, Sams argues that there was no evidence that he was a party to the crimes and that the State's only evidence that was alleged to link Sams to the crimes was uncorroborated accomplice testimony.[3]

When evaluating the sufficiency of evidence as a matter of constitutional due process, the proper standard of review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). This Court views the evidence in the "light most favorable to the verdict, with deference to the

---

[3] Sams also argues that there was no plan to commit a crime and that even if there was a plan, he was not part of it. See *Collins v. State*, 312 Ga. 727, 733 (2) (a) (864 SE2d 85) (2021) (evidence was sufficient to support defendant's conviction as a party to the crime of felony murder predicated on aggravated assault with a deadly weapon in case where defendant was present with co-defendants for the planning of the robbery and followed co-defendants in co-defendant's truck to the area near the victim's house while giving directions). We understand this aspect of his argument as another means of asserting the legal argument that he was not a party to the crimes.

jury's assessment of the weight and credibility of the evidence." (Citation and punctuation omitted.) *Hayes v. State*, 292 Ga. 506, 506 (739 SE2d 313) (2013).

As a matter of Georgia law, OCGA § 16-2-20 (b) provides:

> A person is concerned in the commission of a crime only if he:
> (1) Directly commits the crime;
> (2) Intentionally causes some other person to commit the crime under such circumstances that the other person is not guilty of any crime either in fact or because of legal incapacity;
> (3) Intentionally aids or abets in the commission of the crime; or
> (4) Intentionally advises, encourages, hires, counsels, or procures another to commit the crime.

Moreover, "[w]hile proof of a shared criminal intent with the actual perpetrator is necessary to establish that one is a party to the crime, shared criminal intent may be inferred from the person's conduct before, during, and after the crime." (Citation and punctuation omitted.) *Bowen v. State*, 299 Ga. 875, 877 (1) (792 SE2d 691) (2016); see also *Powell v. State*, 307 Ga. 96, 99 (1) (834 SE2d 822) (2019) ("[C]onviction as a party to a crime requires proof that the defendant shared a common criminal intent with the principal perpetrator of

10

the crime[, which] may be inferred from presence, companionship, and conduct before, during and after the offense." (Citations and punctuation omitted.)).

When a group of individuals join together to plan and commit a crime, each member of the criminal plan is responsible for the criminal acts of the others — regardless of whether a particular act was part of the original plan — as long as such crimes were "naturally or necessarily done" in the execution or furtherance of the common purpose. *Williams v. State*, 276 Ga. 384, 386 (4) (578 SE2d 858) (2003); see also *Menzies v. State*, 304 Ga. 156, 160 (II) (816 SE2d 638) (2018). And "all the participants in a plan to rob are criminally responsible for the act of each committed in the execution of the plan and which may be said to be a probable consequence of the unlawful design," *Williams v. State*, 304 Ga. 658, 662 (1) (821 SE2d 351) (2018) (citation and punctuation omitted), a principle we have specifically held applies to murders committed during the commission of "a crime that foreseeably [leads] to murder" — such as armed robbery — perpetrated by a group that shares a common

11

criminal intent. *Felts v. State*, 311 Ga. 547, 552 (2) (a) (858 SE2d 708) (2021). See also *Moore v. State*, 311 Ga. 506, 509 (2) (858 SE2d 676) (2021).

In addition, OCGA § 24-14-8 provides in pertinent part:

> The testimony of a single witness is generally sufficient to establish a fact. However, in certain cases, including . . . felony cases where the only witness is an accomplice, the testimony of a single witness shall not be sufficient. Nevertheless, corroborating circumstances may dispense with the necessity for the testimony of a second witness[.]

Thus, when the only witness is an accomplice, corroborating evidence is required to support a guilty verdict. See *Edwards v. State*, 299 Ga. 20, 22 (1) (785 SE2d 869) (2016). Whether accomplice testimony has been sufficiently corroborated is a question for the jury, and even slight corroborating evidence of a defendant's participation in a crime is sufficient. See *Raines v. State*, 304 Ga. 582, 588 (2) (a) (820 SE2d 679) (2018). "Moreover, the testimony of one accomplice can be corroborated by the testimony of another accomplice." *Yarn v. State*, 305 Ga. 421, 424 (2) (826 SE2d 1) (2019).

(a) As summarized above, the evidence presented at trial was

12

sufficient as a matter of due process to authorize the jury to find that Sams was guilty of the crimes of which he was convicted. Sams, either as the shooter or as a party to the crimes, fired multiple shots through a door and into a room in Williams's apartment where Jai'mel and J. A. were sleeping. Two of the shots struck and killed Jai'mel, and the shooting constituted an aggravated assault as to J. A. More specifically, the evidence showed that Sams, Eason, Wipfel, Jackson, and Garvin traveled together to the scene of the shooting, that Sams and Eason both had guns at the scene, and that Eason later gave his gun to Wipfel. An investigator testified that 16 rounds were fired through Williams's door. Garvin and Jackson each testified that they saw Sams at the scene with a gun, and Garvin testified that Sams and Wipfel told him that they shot through the door of the apartment. Shell casings from a .40-caliber Glock were found at the scene of the crime, and Sams testified that at one time he owned a .40-caliber Glock. This evidence was sufficient as a matter of due process for a rational jury to find beyond a reasonable doubt that Sams was guilty of malice murder, aggravated assault,

and possession of a firearm during the commission of a felony. See *Johnson v. State*, 302 Ga. 774, 776-777 (2) (809 SE2d 769) (2018) (evidence sufficient to uphold conviction as party to the crime for malice murder where appellant traveled with a rifle with others to the scene of the shooting, shot the victim repeatedly, drove back with the others to a house to hide, and the weapon was linked to appellant); *Stewart v. State*, 299 Ga. 622, 626 (2) (a) (791 SE2d 61) (2016) (holding evidence was sufficient to support convictions for aggravated assault of one victim without gun being pointed directly at that particular victim).

Additionally, Sams decided to go to Fort Valley to retrieve Eason's drugs or money, and Sams armed himself at his apartment before the group went to Williams's apartment. Sams also told his girlfriend that he was going to Fort Valley to obtain marijuana. Moreover, Sams's own testimony indicated that he, Eason, Garvin, Jackson, and Wipfel exited their vehicles in the parking lot of the church just moments before the shooting and that they all left together after the shots were fired. This evidence was sufficient to

14

allow a rational trier of fact to find beyond a reasonable doubt that Sams conspired with Eason, Garvin, Jackson, and Wipfel to confront Williams and that he intentionally aided, encouraged, and participated in the attack on Williams that resulted in the death of Jai'mel and the aggravated assault of J. A. See *Shealey v. State*, 308 Ga. 847, 848-850 (1) (843 SE2d 864) (2020) (evidence sufficient to prove that the appellant, who knew of a plan to "shoot up [victim's] house," traveled to victim's house in a caravan of cars and was in one of the cars that fled after the shooting, was guilty as a party to the murder and not merely present at the crime scene even though appellant did not shoot victim).

(b) Additionally, Sams contends that the State's only evidence that was alleged to link him to the crimes was uncorroborated accomplice testimony from Garvin and Jackson. This contention also fails.

Here, Garvin and Jackson both testified that Sams was at the scene, that Sams had a gun, and that they saw Sams go toward the apartment. Garvin and Jackson also testified that they heard

15

gunshots and then saw Sams go back to the cars after the gunshots. Garvin also testified that Sams told him he and Wipfel shot through the door of Williams's apartment. The testimony from Jackson was sufficient to corroborate that of Garvin and therefore satisfied the requirements of OCGA § 24-14-8. See *Yarn*, 305 Ga. at 424 (2). Moreover, there was other, non-accomplice evidence corroborating the accomplices' testimony. As noted above, Sams's then-girlfriend, Grandison, testified that Sams said he was going to Fort Valley with Wipfel and Eason to get some marijuana and "to see a transaction," and that he carried a firearm with him to travel to Fort Valley. And Sams's own testimony put him in the company of the other members of the group before, during, and after the shooting. Accordingly, there was sufficient evidence corroborating the testimony of Sams's accomplices regarding his participation in the crimes.

3. Sams also contends that the trial court erred by admitting evidence of his 2014 conviction for aggravated assault under OCGA § 24-4-404 (b) for the purposes of demonstrating motive, intent, and knowledge. However, we need not decide whether the admission of

16

this evidence was erroneous, because any such error was harmless.

"The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." *Kirby v. State*, 304 Ga. 472, 478 (3) (c) (819 SE2d 468) (2018) (citation and punctuation omitted). See also OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[.]"). "'In determining whether the error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so.'" *Kirby*, 304 Ga. at 478 (3) (c) (citation omitted).

Over objection, the trial court admitted the evidence of Sams's prior aggravated assault conviction arising out of a dispute in January 2014 in which Sams repeatedly shot at and hit a truck occupied by Matiuwanna Johnson following an argument between Johnson and others living at their shared home. Johnson and Candy Clark testified that the dispute occurred when Sams was living with Johnson, Candy, Ja'Neisha Clark, and Sams's son, Chevel Sams.

17

Johnson and Candy had a disagreement about Sams living at the house because Sams was unemployed and not contributing financially. After a prolonged argument, Johnson said he "just wanted to leave" and packed a suitcase and started to leave in his truck. When Johnson reached the end of the driveway, Sams shot at Johnson's truck 15 times. Sergeant Jeffrey Woodard testified that several bullet holes were "scattered about the truck," with most of the bullets striking the back of the truck. Sams pled guilty to aggravated assault following the 2014 incident, and, in addition to testimony concerning the circumstances of the crime, the State presented a certified copy of Sams's guilty plea in this case.

Before Johnson testified, the trial court gave the jury the following limiting instruction:

> The State has informed me that the next two witnesses of their case are going to deal with a previous conviction of Mr. Sams. Now, I want to reiterate, this is going to be shown for a limited purpose, and that's all you're going to consider it for. What you cannot consider this evidence of an earlier incident is to make the assumption that, well, you committed one crime, you must have committed the other. That's not the purpose. You're not allowed to make that sort of inference. And it

only applies to Mr. Sams, not the other two Defendants. So I just want to make sure you understand, the State will identify to you later — they'll tell you the specific reasons that they're going to use this. I'll tell you in my instructions the specific reason that the State[ ] is attempting to prove, and then you'll decide — I'll give you some more instructions and you will decide whether they've done that or not. But you can't use it for a basic assumption.

Additionally, at the conclusion of the trial, the trial court gave

the following limiting instruction:

> Sometimes evidence is admitted for a limited purpose or against some parties and not others or for some counts and not others. You may consider such evidence for these limited purposes, only against the party against whom it was offered and only for the counts to which the evidence is limited. It may not be considered for any other purpose.
> You have received in evidence a prior conviction of Defendant Sams. You may consider this evidence only insofar as it may relate to attacking his credibility and the limited purpose described below.
> In order to prove . . . its case in Counts 1-6 against Defendant Sams, the State must show knowledge and intent, and it may show motive. To do so, the State has offered evidence of another crime that Defendant Sams allegedly committed. You are permitted to consider that evidence only insofar as it may relate to those issues and not for any other purpose. You may not infer from such evidence that the defendant is of a character that would commit such crimes.
> Defendant Sams is on trial for the offenses charged

> in this bill of indictment only and not for any other act, even though such act may incidentally be criminal and may have resulted in conviction.
>
> Before you may consider any other alleged act for the limited purposes stated against Defendant Sams, you must first determine whether it is more likely than not that he committed the other alleged act.

Assuming without deciding that the trial court erred by admitting evidence of the 2014 aggravated assault, any such error was harmless. That is because the central issue in this case was whether Sams participated in the crimes of which he was convicted or just happened to be with associates who did. On that issue, the evidence that he did participate in the crimes was very strong.

Significant evidence supported Sams's participation in the criminal enterprise that led to the shooting at Williams's apartment. Sams's then-girlfriend's testimony indicated that Sams armed himself before traveling to Fort Valley. Sams placed himself at the scene of the murder. Sams's testimony also put himself in the company of the other men whose participation before, during, and after the shooting was not disputed. Garvin and Jackson each testified that they saw Sams at the scene with a gun, and Garvin

20

testified that Sams told him that he shot through the door of the apartment. Additionally, shell casings from a .40-caliber Glock were found at the scene of the crime, and Sams testified that at one time he owned a .40-caliber Glock. And the trial court instructed the jurors on the limited purpose for which they could consider the 2014 incident, to which Sams had pled guilty. See *Howell v. State*, 307 Ga. 865, 875 (3) (838 SE2d 839) (2020) (considering the trial court's instructions on the limited use of other-acts evidence in determining harmless error, because "[w]e ordinarily presume that jurors follow their instructions"); *Kirby*, 304 Ga. at 485 (4) (a) (i) (explaining that the risk that a jury may convict a defendant not for the offense charged but for his extrinsic conduct is greater where the extrinsic conduct was not already the subject of a conviction).

For these reasons, we conclude it is highly probable that any error in admitting the other-acts evidence did not contribute to the verdicts. See *Jackson v. State*, 306 Ga. 69, 81 (2) (829 SE2d 142) (2019) (concluding that the erroneous admission of evidence of a prior shooting did not contribute to the jury's verdicts "given the

21

overall strength of the other evidence" of guilt); see also *Keller v. State*, 308 Ga. 492, 503 (5) (842 SE2d 22) (2020) (determining that evidentiary error was harmless "in light of the strong evidence of [appellant's] guilt"). Thus, this contention fails.

*Judgment affirmed. All the Justices concur.*

Decided June 30, 2022 — Reconsideration dismissed July 14, 2022.

Murder. Peach Superior Court. Before Judge Mincey.

*The Merchant Law Firm, Ashleigh B. Merchant, John B. Merchant III*, for appellant.

*Anita R. Howard, District Attorney, Daniel P. Bibler, Neil A. Halvorson, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Kathleen L. McCanless, Assistant Attorney General*, for appellee.