314 Ga. 598
FINAL COPY

S22A0466. WARREN v. THE STATE.

PINSON, Justice.

After a jury trial, Brandon Jerard Warren was convicted of malice murder and other offenses in connection with killing Samuel Poss and hiding his body.[1] On appeal, Warren contends that his trial counsel gave ineffective assistance in violation of the Sixth

---

[1] On August 8, 2017, a Houston County grand jury indicted Warren and a co-defendant, Dakota White, on six counts: malice murder, felony murder, two counts of aggravated assault, concealing the death of another, and tampering with evidence. The two defendants were tried separately. White was tried first and was convicted on all counts. White was sentenced to life without parole, and we affirmed his convictions and sentence on appeal. See *White v. State*, 307 Ga. 601 (837 SE2d 838) (2020). Warren's trial followed, taking place from May 14 to 16, 2018. He was found guilty on all counts. On May 16, 2018, Warren was sentenced to serve life in prison without the possibility of parole for malice murder, ten years for concealing the death of another, and ten years for tampering with evidence, all to be served concurrently. The aggravated assault count merged with the malice murder count for sentencing. The trial court purported to merge the felony murder count with the malice murder count, but the felony murder count was actually vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 371-72 (4) (434 SE2d 479) (1993). Warren timely filed a motion for new trial on May 25, 2018, which he later amended through new counsel. On September 10, 2021, following a hearing, the trial court denied Warren's motion for new trial, as amended. Warren timely filed a notice of appeal on October 7, 2021. The case was docketed to the April 2022 term of this Court and submitted for a decision on the briefs.

Amendment to the United States Constitution. He faults counsel for failing to object when the prosecutor argued during closing that the State's burden of proof "beyond a reasonable doubt" did not require "mathematical certainty" like "95 percent [or] 85 percent," and for failing to give Warren adequate advice about the risks of testifying. But Warren has not established a reasonable likelihood that the outcome of his trial would have been different if his counsel had objected to the prosecutor's remark, given the strong evidence against him. And he has not shown that trial counsel's advice to Warren about his right to testify, which included explaining the pros and cons of testifying and telling him the decision was his to make, fell outside the wide range of reasonable professional conduct. So we affirm Warren's convictions.

1. (a) The evidence at Warren's jury trial showed the following. According to Warren's co-defendant, Dakota White, he and Warren had been talking in the days before the crimes about finding someone to kill, "to see what it felt like." One evening, while the two were at White's house, White saw an acquaintance, Samuel Poss,

2

online on a gaming website. White messaged Poss that he was having trouble with his computer and asked if Poss would come over to help. White testified that the message was a false pretense to get Poss to come over so that Warren and White could kill him, and Warren and White both knew this.

Poss agreed to come over, so Warren and White drove to pick him up at his house. White had electric cords in the car and a knife in the glovebox, and Warren had a knife with him, too. When the three of them returned to White's driveway, White put a cord around Poss's neck and "tried to strangle him." The cord soon broke, so White put his arm around Poss's neck and continued strangling him. At that point, according to White, Warren stabbed Poss "at least three times" with his knife. A forensic pathologist testified at trial that Poss suffered eleven "sharp force injuries," and that his death was caused by those injuries in conjunction with strangulation.

After Poss died, Warren and White went inside to clean up, and Warren buried his knife in the back yard. They took Poss's body to a vacant lot, where they buried him. White drove Warren home. Two

days later, Warren and White met up again. Warren dug up his knife and put it with White's knife in a Ziploc bag, and then White threw the bag off the side of a bridge.

The day after the killing, White's mother noticed blood in the back of the car. White told her what he had done. White was arrested four days later. In a police interview, White admitted to killing Poss and implicated Warren. He later showed police where to find the body and the two knives.

The knives were recovered and introduced at trial. Warren's knife had a blue handle, and the knife that White had kept in the glove compartment had a brown handle. A DNA analyst from the Georgia Bureau of Investigation testified that both knives were tested for DNA on their handles and on their blades. On the blue knife, analysts found DNA from a mixture of at least three individuals, at least one of whom was male; White was excluded as a contributor, but neither Poss nor Warren could be ruled out. On the brown knife, no DNA was found on the blade, White's DNA was found on the handle, and both Poss and Warren were excluded as

contributors. In short: the brown knife had White's DNA on it but not Poss's or Warren's; and the blue knife may have had Poss's DNA on it and may have had Warren's on it, but did not have White's.

The State also introduced a letter that Warren had written to his father from jail. In the letter, Warren told a story largely consistent with White's testimony, but with a few more details. Warren wrote that White, not Warren, had stabbed Poss with the brown knife. And Warren wrote that when he gave the blue knife to White, White did not touch the knife with his hand, but instead used one of Warren's socks to take it.

Warren testified in his own defense. Before he was sworn in, his counsel asked whether he understood that he was under no obligation to testify, that the prosecutor could ask him questions if he did testify, and that if he decided not to testify the judge would tell the jury that they could not hold that against him. Warren said he understood.

Warren's testimony about the night of the murder—like his narrative in his letter to his father—mostly tracked White's story,

but with a few exceptions. Warren testified that when White started talking about wanting to find someone to kill, he also talked about killing *Warren*, and Warren became afraid. Warren said that after he and White picked up Poss and were taking him back to White's house, Warren drove in the middle of the road, with his high-beam lights on, hoping the police or someone would notice them. Warren denied doing anything to conceal the knives after the murder. Warren also testified that White, not Warren, stabbed Poss. This time, however, he said that his blue knife was used. He denied helping in any way to kill Poss.

During closing argument, the prosecutor commented on the State's burden of proof. He said that the State's burden was proof "beyond a reasonable doubt and the Court will tell you again what that is. It's not to a mathematical certainty, it's not 95 percent, 85 percent, it's a doubt of a fair-minded, reasonable person." The defense did not object to this comment.

Later, the trial court instructed the jury on the State's burden of proof, explaining:

No person shall be convicted of any crime unless and until each element of that crime is proven beyond a reasonable doubt. . . . [T]he State is not required to prove the guilt of the accused beyond all doubt or to a mathematical certainty. A reasonable doubt means just what it says. That's the doubt of a fair-minded, impartial juror who is honestly seeking the truth. It's a doubt that can be based on [common] sense and reason. It's not some vague or fanciful or speculative doubt, but it's a doubt for which you can give a reason. It may arise from the evidence you've heard or from a lack of evidence or a conflict in evidence or some combination of those things.

Warren was convicted on all counts. He was sentenced to life in prison without the possibility of parole.

(b) In his motion for new trial, Warren raised two claims of ineffective assistance of counsel. He contended that his counsel should have objected to the prosecutor's closing-argument remark that proof beyond a reasonable doubt was not "95 percent, 85 percent." And he argued that his counsel failed to adequately inform him about the dangers of taking the stand in his own defense.

At the hearing on his motion for new trial, Warren and his trial counsel both testified. Trial counsel testified that he talked with Warren "more than half a dozen times" about the possibility of

7

testifying at trial, going over "the pros and cons of . . . giving testimony." He said that he had wanted to be sure Warren could "handle" testifying, given his "meek" and "quiet" nature. Trial counsel admitted that he had concerns about Warren testifying, but that he did not advise Warren either to do so or not. Trial counsel explained that it was Warren's decision whether to testify, and that "when a client tells me they want to testify, they testify. . . . I don't try to talk them out of it." By contrast, Warren himself testified that his trial counsel did not speak with him about his possible trial testimony or about the pros and cons of testifying.

The trial court denied the motion for new trial. The court found that Warren was not prejudiced by his counsel's failure to object to the prosecutor's closing argument, because the evidence against him was considerable. And the trial court found that trial counsel did advise Warren of his right to testify, including the "pros and cons" of doing so. The court concluded that Warren's decision to testify was tactical and that counsel's advice on the matter was within the bounds of reasonable trial strategy.

2. On appeal, Warren raises the same claims of ineffective assistance of counsel that he raised in his motion for new trial. In reviewing those claims, we accept the trial court's factual findings unless clearly erroneous, but we independently apply legal principles to the facts. See *Lyons v. State*, 309 Ga. 15, 25 (8) (843 SE2d 825) (2020).

To succeed on a claim of ineffective assistance, a defendant must establish both that his counsel's performance was deficient and that he was prejudiced as a result of that deficient performance. *Washington v. State*, 313 Ga. 771, 773 (3) (873 SE2d 132) (2022) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984)).

To prove deficient performance, a defendant must establish that counsel "performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms." *Washington*, 313 Ga. at 773 (3) (citation and punctuation omitted). To overcome the "strong presumption" that counsel performed reasonably, the defendant must show that "no

9

reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not." Id. (citation and punctuation omitted). And counsel's decisions about trial tactics and strategy in particular may not form the basis of an ineffectiveness claim unless they were "so patently unreasonable that no competent attorney would have followed such a course." Id. (citation and punctuation omitted).

To prove prejudice, a defendant must establish that there is a "reasonable probability that, but for counsel's deficiency, the result of the trial would have been different." *Washington*, 313 Ga. at 773 (3). A reasonable probability is a probability "sufficient to undermine confidence in the outcome" of the trial. *Neal v. State*, 313 Ga. 746, 751 (3) (873 SE2d 209) (2022) (citation and punctuation omitted).

(a) Warren first contends that his counsel was ineffective for failing to object when the prosecutor remarked during his closing argument that the State's burden of proof—proof of guilt beyond a reasonable doubt—did not mean "to a mathematical certainty, it's not 95 percent, 85 percent."

For this claim, Warren relies on *Debelbot v. State*, 308 Ga. 165 (839 SE2d 513) (2020), in which we held that counsel gave constitutionally ineffective assistance for failing to object to the prosecutor's remarks that proof beyond a reasonable doubt "does not mean to a mathematical certainty," and that the jury did not have to be "ninety percent," or "eighty percent," or even "fifty-one percent sure." Id. at 167. We explained that "the argument that proof beyond a reasonable doubt requires something less than proof that leaves a jury with 51 percent certainty is 'obviously wrong,'" and we saw "no good reason that any reasonably competent lawyer would fail to object to 'such an egregious misstatement of the law.'" Id. We also concluded that counsel's failure to object prejudiced the two defendants because it was "uniquely harmful" in that case. Id. at 168. We explained that not only was evidence of guilt "notably lacking" and "underwhelming" in key respects, but also that the prosecutor's 51-percent argument may well have persuaded the jury to convict both defendants based on "something less than a 51 percent probability of guilt," because the trial evidence did not show

which of the two defendants was more likely to have committed the crime. Id. at 168-69.

But the much closer comparator here is *Draughn v. State*, 311 Ga. 378 (858 SE2d 8) (2021), which we decided a year after *Debelbot*. Like Warren, Draughn raised an ineffectiveness claim that relied on *Debelbot*, based on a closing-argument remark that beyond a reasonable doubt "is not beyond all doubt. It's not 90 percent or 95 percent." Id. at 382 (2). We rejected Draughn's claim. In doing so, we explained that even assuming counsel should have objected to the remark, Draughn was not prejudiced because the evidence against him was "plainly sufficient," and the prosecutor's "characterization of reasonable doubt was considerably less blatant than the error in *Debelbot* and—unlike in *Debelbot*—was cured by the trial court's instructions to the jury, which explained presumption of innocence, burden of proof, and reasonable doubt accurately and at length." Id. at 383 (2) (b).

We reach the same conclusion about prejudice here. Once again, remarks like the prosecutor's here are "at the very least

inadvisable." *Draughn*, 311 Ga. at 383 (2) (b) n.5 (citing *Debelbot*, 308 Ga. at 169 n.9 ("We admonish lawyers not to confuse jurors by attempting to quantify a standard of proof that is not susceptible of quantification.")). But even assuming trial counsel's failure to object to those remarks amounted to deficient performance, Warren was not prejudiced. The evidence of Warren's guilt was strong: White's testimony implicated Warren, and that testimony was largely consistent with Warren's own testimony, differing only as to who had stabbed Poss—and the jury could have found Warren guilty based on all of that testimony as a party to the crime regardless of who had stabbed Poss. See OCGA § 16-2-20 (defining "party to a crime"); *Powell v. State*, 307 Ga. 96, 99 (1) (834 SE2d 822) (2019) (defendant can be convicted as a party to a crime if he shared a common criminal intent with the principal perpetrator, which may be inferred from presence, companionship, and conduct before, during, and after the offense). Moreover, the DNA evidence from the knives made it more likely that Warren had stabbed Poss. Finally, Warren has not pointed to anything in this case like the

circumstances in *Debelbot* that made the prosecutor's more egregious remark "uniquely harmful" there, and the trial court here "explained presumption of innocence, burden of proof, and reasonable doubt accurately and at length," like the trial court in *Draughn*. 311 Ga. at 383 (2) (b). In short, it is not reasonably probable that counsel's failure to object to the prosecutor's remark affected the outcome of Warren's trial. See *Draughn*, 311 Ga. at 383 (2) (b). See also *Lane v. State*, 312 Ga. 619, 624-25 (2) (b) (864 SE2d 34) (2021) (defendant not prejudiced by counsel's failure to object to prosecutor's closing-argument bolstering of the credibility of a prosecution witness given substantial evidence of guilt); *Jones v. State*, 288 Ga. 431, 434 (704 SE2d 776) (2011) (defendant not prejudiced by counsel's failure to object to prosecutor's remark about defendant's future dangerousness given overwhelming evidence of guilt). So this claim of ineffective assistance fails. See *Washington*, 313 Ga. at 773 (3).

(b) Warren also contends that his counsel was ineffective for failing to adequately advise him about his right to testify.

14

The Fifth Amendment to the United States Constitution's right against compelled self-incrimination, made applicable to the states by the Fourteenth Amendment, protects a criminal defendant's right to decline to testify in his own defense. *Vega v. Tekoh*, ___ U.S. ___, ___ (II) (A) (142 SCt 2095, 2101, 213 LE2d 479) (2022); *Pender v. State*, 311 Ga. 98, 120 (7) (856 SE2d 302) (2021). The defendant may also waive that right and take the stand. The decision whether to testify in one's own defense "is a tactical decision to be made by the defendant himself after consultation with trial counsel." *State v. Goff*, 308 Ga. 330, 334 (1) (840 SE2d 359) (2020) (citation and punctuation omitted).

Here, the trial court found that counsel had consulted with Warren about his decision whether to testify. The court found that counsel "always" told clients if he thought it would be bad to testify, and that he "always" told clients the "pros and cons" of testifying, but that counsel "did not in the end tell [Warren] he should or should not testify."

Warren contends that this advice was not good enough. In his

15

view, constitutionally effective assistance required counsel to do more than merely lay out the reasons for and against testifying and then leave the decision to him. Instead, effective counsel would have told him what to do. If his counsel knew his testimony would be "detrimental," Warren says counsel should have advised him not to testify.

But we have regularly concluded that advice along the lines trial counsel gave here is within the wide range of reasonable professional conduct. When advising a defendant about the decision whether to testify in his own defense, it is generally enough for counsel to advise the defendant about the "pros and cons" of testifying and explain that the ultimate choice is the defendant's to make, whether the defendant testifies and then regrets it (as here), or does not testify and later wishes he had. See, e.g., *Thomas v. State*, 300 Ga. 433, 439 (2) (a) (2) (796 SE2d 242) (2017) (no deficient performance when trial counsel explained "the good parts and the bad parts" of testifying and told defendant the final decision was his); *Turner v. State*, 300 Ga. 513, 515 (2) (b) (796 SE2d 698) (2017)

16

(no deficient performance when trial counsel advised defendant about right to testify, the reasons he might not want to do so, and that the decision was his). See also *Jackson v. State*, 306 Ga. 475, 480-81 (4) (b) (831 SE2d 755) (2019) (defendant's failure to testify on his own behalf was not connected to any alleged deficiency of counsel when defendant was "fully informed" of his right to testify, including that the ultimate decision was his); *Leanos v. State*, 303 Ga. 666, 671 (2) (c) (i) (814 SE2d 332) (2018) (same). Of course, as with any issue in this context, we consider the circumstances of each particular case to determine a lawyer's effectiveness in advising the defendant about the right to testify. See *Lockhart v. State*, 298 Ga. 384, 385 (2) (782 SE2d 245) (2016) (reasonableness of counsel's conduct is examined "from counsel's perspective at the time of trial and under the particular circumstances of the case"). But Warren points to nothing about the circumstances here that would make counsel's advice deficient. So this claim of ineffective assistance fails as well.[2]

---

[2] We also reject Warren's argument that he was prejudiced by the cumulative effect of trial counsel's deficient performance. "Assessing

17

*Judgment affirmed. All the Justices concur.*

Decided September 20, 2022.

Murder. Houston Superior Court. Before Judge Lukemire.

*Greg H. Bell*, for appellant.

*William M. Kendall, District Attorney, Rodrigo L. Silva, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Alex M. Bernick, Assistant Attorney General*, for appellee.

---

cumulative prejudice is necessary only when multiple errors have been shown." *Scott v. State*, 309 Ga. 764, 771 (3) (d) (848 SE2d 448) (2020). Warren has not established multiple instances of deficiency because he raised only two claims of ineffective assistance, and we have concluded that he failed to show that counsel's advice about Warren's right to testify was deficient.