320 Ga. 43
FINAL COPY

S24A0610. NABORS v. THE STATE.

LaGrua, Justice.

In March 2020, Appellant Brejon Nabors was convicted of malice murder and related charges in connection with the shooting death of Mondavius Milan.[1] On appeal, Nabors contends (1) trial counsel was ineffective for advising Nabors not to testify in his own defense, and (2) the State failed to prove guilt beyond a reasonable doubt because the verdict was based exclusively on accomplice testimony. For the reasons explained herein, we affirm.

---

[1] The crimes occurred in Atlanta on April 3, 2018. On August 25, 2018, a Fulton County grand jury indicted Nabors for malice murder (Count 1), two counts of felony murder (Counts 2 and 3), aggravated assault with a deadly weapon (Count 4), possession of a firearm during the commission of a felony (Count 5), and possession of a firearm by a convicted felon (Count 6). Nabors was tried March 9-13, 2020, and the jury found him guilty on all counts. The trial court sentenced Nabors to serve life in prison for Count 1 and five years consecutive for both Counts 5 and 6, merged Count 4 into Count 1, and vacated Counts 2 and 3. Nabors, through trial counsel, timely moved for a new trial on March 18, 2020. Nabors obtained new counsel and filed an amended motion for new trial on January 31, 2023. After an evidentiary hearing, the trial court denied Nabors's motion on June 30, 2023. Nabors filed a timely notice of appeal, and his case was docketed to this Court's April 2024 term and submitted for a decision on the briefs.

The evidence at trial established that, in the days leading to the shooting, Nabors, Milan, and Jaleesia Mathis were involved in a check fraud scheme: they would open a bank account, deposit a fraudulent check or money order, and withdraw cash before the bank discovered the fraud. On April 2, 2018, the day before the shooting, Milan drove Nabors and Mathis in Nabors's black, two-door Chevrolet Monte Carlo[2] to open accounts and make fraudulent deposits in furtherance of the scheme. They planned to withdraw cash the following day.

On the morning of April 3, 2018, between 6:00 and 7:00 a.m., Nabors and Milan arrived at Mathis's apartment to pick her up. Mathis lived with Japhar White, her then-romantic partner and the father of her two children. White was not previously involved in the check fraud scheme, but Mathis asked him to ride along that morning for her protection. Nabors asked Mathis to drive because "[t]hey said that they had been out all night," were tired, and were

_____

[2] The Monte Carlo was registered to Nabors's mother, who testified it belonged to her son. Both Mathis and Japhar White testified that this Monte Carlo was driven by Nabors.

on drugs. White stated at trial "[they] were all high" on the morning of the shooting, including himself. The group left Mathis's apartment and got into Nabors's Monte Carlo: Mathis drove, Nabors was in the passenger seat, Milan was seated behind Mathis, and White was seated behind Nabors.

During the trip, Mathis and White testified that Nabors raised the issue of money missing from an account and accused Milan of stealing it. Milan denied the accusation, but his denial did not defuse the situation. As accusation turned to argument, Mathis saw Nabors pull out and cock a gun between his legs, while demanding that Milan tell him where the money was. Mathis testified that, moments later, Milan reached over the driver's seat, grabbed the steering wheel, and swerved the vehicle off the road. White also testified that Milan grabbed the steering wheel and forced the vehicle off the road, but White had not yet seen a gun at that time. The vehicle came to rest in a field surrounded by trees across from a gas station.

As soon as the vehicle came to a stop, Mathis exited the driver's

3

door and ran toward the woods, leaving her shoes and purse behind. Mathis testified that she immediately ran because she "had a warrant" for violating her probation and was driving without a license. Mathis heard gunshots while running. After the shots, Mathis saw Nabors run "another way" toward the tree line and heard him yelling, "F**k, f**k, f**k."

White testified that, just after the vehicle went off the road, Nabors and Milan "got to tussling" over what "had to be the gun," first in the car and then just outside of it. White told the police he saw Nabors with a gun and that Nabors fired a gun in Milan's direction.[3] After the first gunshot, White took off running for the woods. White testified that he ran in part because he was on probation and "ain't supposed to be around nothing like that." Like Mathis, White also saw Nabors run toward the tree line after the shooting. Both Mathis and White saw Milan moving toward the road

---

[3] White made this statement to the police on the day of the shooting. At trial, White initially testified on direct examination that he "heard a shot" but "didn't see a weapon," and that he did not remember much of his statement to the police. However, White later stated on re-direct examination that Nabors had a gun on the day of the shooting.

after the gunshots, and neither saw Nabors again. Nabors fled the scene and ultimately, the state. Milan fell to the ground near the road after being shot. A medical examiner testified at trial that Milan's death was caused by two gunshot wounds: one to the abdomen and one to the back.

Three eyewitnesses who testified at trial were at a gas station across the street from the field where the shooting occurred. Two were police officers. One of the officers was inside a patrol vehicle when he heard three gunshots coming from the direction of the field across the road. As the police officer exited the patrol vehicle, he saw three people running from the Monte Carlo — two in the direction of the woods and a third toward the road. At trial, the police officer testified that the person who ran toward the road was a male victim — later identified as Milan — but he was unsure whether the others were male or female. The second police officer also saw three people run from the Monte Carlo after hearing gunshots, but said all three ran in the same direction toward the woods. Beyond confirming that the victim was male, the second officer was similarly unsure of the

5

gender of the runners. Neither police officer recalled seeing a fourth runner. The third witness at the gas station testified that her attention was drawn to the Monte Carlo by the sound of arguing, immediately followed by gunfire. This witness testified that she saw three or four people around the vehicle, including a man later identified as Milan, who she described as "running around the car," "dodging," trying "to get away," and "running for his life" before being shot twice by a different man with a gun. The witness further testified to seeing Milan run toward the road after being shot and then collapse. The witness said she saw at least two people run together into the woods — one of whom was the male shooter — but she could not be sure of the gender of the other people running.

Mathis and White re-connected in the woods just after the shooting and attempted to evade the police for a short time before being separated. White was captured by the police approximately 15 minutes after the shooting and taken into custody. Mathis successfully evaded the police before turning herself in that afternoon. While in custody, Mathis and White waived their

6

*Miranda*[4] rights, were interviewed by the police, and identified Nabors as the shooter. White's hands were tested for gunshot residue, and the results were negative. Mathis was never tested for gunshot residue. Based in part on the statements made by Mathis and White, a warrant was issued for Nabors's arrest. The warrant remained outstanding until May 17, 2018, when Nabors was arrested by law enforcement in Massachusetts during the execution of an unrelated warrant, and he was then extradited to Georgia.

In addition to eyewitness testimony, the State presented expert testimony from a police investigator regarding the call logs and cell site location data for phone numbers belonging to Nabors and Mathis. The call logs showed a series of calls made or attempted between Nabors's phone and Mathis's phone in the hours immediately prior to the shooting. The final recorded outgoing call from Nabors's device at 6:22 a.m. placed his phone in the vicinity of AMC South Hospital — away from the location of the shooting — which was consistent with the testimony of Mathis and White, who

---

[4] *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

stated Nabors went to the hospital with Milan and others in the early morning hours of April 3, 2018. However, the data offered no insight into Nabors's location after 6:22 a.m., Nabors's call logs showed no outgoing activity after that time, and his phone stopped receiving calls shortly thereafter, indicating the device was powered off. When Nabors was taken into custody in Massachusetts, he was in possession of a different phone that had been activated two days after the shooting. Cell site data from Mathis's phone number indicated the location of her phone to be in the vicinity of the shooting after 7:00 a.m.

1. Nabors contends trial counsel was ineffective for advising him not to testify at trial in his own defense. We disagree.

To prevail on an ineffective assistance of counsel claim, a defendant must establish (1) that performance of his or her counsel was deficient and (2) that the deficient performance resulted in prejudice to the defense. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). Failure to satisfy either prong is fatal to a claim. See *Lawrence v. State*, 286 Ga. 533,

8

533-534 (2) (690 SE2d 801) (2010) ("If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong."). As discussed below, because we conclude that Nabors failed to establish deficient performance by trial counsel, his ineffectiveness argument fails, and we need not address prejudice.

To establish deficient performance, a defendant must show his or her "counsel performed in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Ward v. State*, 318 Ga. 884, 896 (3) (901 SE2d 189) (2024) (citation and punctuation omitted). Put differently, it must be shown that "no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not." *Warren v. State*, 314 Ga. 598, 602 (2) (878 SE2d 438) (2022) (citation and punctuation omitted). We evaluate performance "from counsel's perspective at the time of trial and under the particular circumstances of the case." *Taylor v. State*, 312 Ga. 1, 15 (6) (860 SE2d 470) (2021) (citation and punctuation omitted). We also afford

9

a "strong presumption that counsel's performance fell within a wide range of reasonable professional conduct, and that counsel's decisions were made in the exercise of reasonable professional judgment." Id. (citation and punctuation omitted). This is particularly true when it comes to trial strategy and tactics. See *Warren*, 314 Ga. at 602 (2) ("[D]ecisions about trial tactics and strategy in particular may not form the basis of an ineffectiveness claim unless they were 'so patently unreasonable that no competent attorney would have followed such a course.'") (citation omitted).

"In Georgia, whether or not to testify in one's own defense is considered a tactical decision to be made by the defendant himself after consultation with his trial counsel[.]" *Burton v. State*, 263 Ga. 725, 728 (6) (438 SE2d 83) (1994). Moreover, trial counsel's advice to a defendant regarding a defendant's choice is considered tactical or strategic. See *State v. Goff*, 308 Ga. 330, 334 (1) (840 SE2d 359) (2020) ("Such strategic choices include the decision to advise a defendant not to testify."). In this context, "it is generally enough for counsel to advise the defendant about the 'pros and cons' of

10

testifying and explain that the ultimate choice is the defendant's to make, whether the defendant testifies and then regrets it . . . or does not testify and later wishes he had." *Warren*, 314 Ga. at 604 (2) (b).

At the close of the State's case-in-chief and outside the presence of the jury, Nabors's counsel moved for a directed verdict, which the trial court denied. Immediately thereafter, the trial court informed Nabors he had the right to testify and that the decision to testify was his own. Nabors affirmed he understood those rights, affirmed he had been provided an opportunity to consult with trial counsel about testifying, affirmed such conversations had occurred, and affirmed he was satisfied with those conversations. Upon the jury's return, the trial court invited Nabors to call witnesses and introduce evidence. Nabors opted not to present any witnesses or evidence. During closing, Nabors's trial counsel (1) argued that Nabors could not have shot Milan because he was asleep at the time; (2) theorized Mathis or White was the real killer;[5] and (3) characterized various

---

[5] In support of this theory, Nabors's trial counsel highlighted Mathis and White's relationship and shared children; Mathis's and White's flight from the

11

pieces of evidence pointing to Nabors as the shooter as unreliable.

In Nabors's amended motion for new trial, he argued that his trial counsel gave constitutionally deficient advice by "improperly counsel[ing] [him] not to testify in his own defense." During a hearing on that motion, Nabors and his trial counsel testified. Nabors asserted that he wanted to testify, but that trial counsel "kept strongly advising me not to." Specifically, Nabors recounted that trial counsel advised him against testifying because "he told me that, basically, I was no match for the — like, the DA I was facing and that she would probably open up loopholes against me." However, Nabors affirmed that he understood that the decision not to testify was ultimately his to make, and that he elected not to testify. Trial counsel testified at the motion for new trial hearing that he advised Nabors not to testify during trial, and that Nabors

scene; the fact that neither Mathis nor White suffered adverse probation consequences resulting from the check fraud scheme or being at the scene of Milan's shooting; the fact that money had been withdrawn from Mathis's account prior to Milan's shooting by someone other than herself; and conflicting testimony as to whether three or four people were seen running from the Monte Carlo.

12

reached his decision independently "in the back area prior to coming out" at trial. Trial counsel characterized the defense theory he employed in Nabors's case as a "standard, reasonable doubt defense," which aimed to show the jury that the State could not prove Nabors was at the scene or guilty of the alleged crimes beyond a reasonable doubt. As for the reasons trial counsel advised Nabors not to take the stand, trial counsel testified that he believed that Nabors's testimony could hurt the defense and that the risk for harm arising from Nabors's testimony outweighed any potential benefit. Specifically, trial counsel reasoned that Nabors's testimony could be damaging because (1) the prosecutor was highly skilled and could hurt Nabors's credibility on cross-examination; (2) there were no witnesses who could corroborate Nabors's story that he was not involved in the shooting and was asleep at the time;[6] and (3) putting

---

[6] During his motion for new trial hearing Nabors maintained that if he had testified at trial, he would have admitted to involvement in the check fraud scheme but denied shooting Milan or even being at the scene. Instead, he would have testified to being asleep at Mathis's apartment during the shooting, that his phone was turned off because it was charging, that he loaned his car to Mathis, White, and Milan on the morning in question, and that his trip to Massachusetts two days after the shooting was unrelated to Milan's death.

Nabors on the stand could open the door to past felony convictions for impeachment purposes, which could further damage his credibility with the jury.[7] After the hearing, the trial court denied Nabors's amended motion for new trial, concluding that, based upon "the testimony of trial counsel, the witness adduced, the record and the argument of the parties," that Nabors "failed to show either deficient performance or harm arising from any of his allegations of ineffective assistance."

The trial court concluded that trial counsel's performance in this case was not constitutionally deficient, and we agree. Again, "it is generally enough for counsel to advise the defendant about the 'pros and cons' of testifying and explain that the ultimate choice is the defendant's to make[.]" *Warren*, 314 Ga. at 604-605 (2) (b). That is precisely what Nabors's trial counsel did here: he advised Nabors not to testify because of the prosecutor's skill, a lack of corroboration

---

[7] The parties stipulated at trial that Nabors was a convicted felon, so the jury never learned the conviction was for armed robbery. Nabors had additional felony convictions that were more than ten years old which trial counsel advised might come in if Nabors testified.

for Nabors's version of events, and the risk of a damaging cross-examination that could hurt Nabors's credibility with the jury. Nabors's trial counsel then left the decision about whether to testify to Nabors, who made that decision himself. Beyond Nabors's present claim that the pros of testifying outweighed the cons — a position colored by hindsight — he has not shown that his trial counsel's advice or strategy was unreasonable. And importantly, Nabors has not shown that no reasonable lawyer would have rendered the same advice nor that his trial counsel's advice was "so patently unreasonable that no competent attorney would have followed such a course." *Warren*, 314 Ga. at 602 (2) (citation and punctuation omitted). To the contrary, we have previously determined that trial counsel has acted appropriately in a range of similar circumstances. See, e.g., *Moulder v. State*, 317 Ga. 43, 54 (3) (c) (891 SE2d 903) (2023) (concluding trial counsel's performance was not deficient and that trial counsel performed reasonably when he advised defendant that the State could attempt to impeach him with convictions more than ten years old if he took the stand); *Goff*, 308 Ga. at 334-335 (1)

(holding trial counsel's advice against testifying was not deficient or unreasonable because testifying could subject the defendant to damaging cross-examination and undermine the theory of the defense); *Hamilton v. State*, 274 Ga. 582, 589 (13) (555 SE2d 701) (2001) (concluding trial counsel did not perform deficiently in urging defendant not to testify in part because "they expected the prosecuting attorney to make very effective cross-examination"); *Barnett v. State*, 300 Ga. 551, 557 (3) (796 SE2d 653) (2017) (concluding trial counsel's strategy of advising defendant not to testify while offering alternative narrative of events to the jury was not deficient performance and was reasonable in an effort to avoid "damaging cross-examination").

We have also said that when a defendant has been advised of his rights and makes an informed decision after consultation with trial counsel, a defendant's "failure to testify on his own behalf [is not] in any way connected to any alleged deficiency of his trial counsel." *Jackson v. State*, 306 Ga. 475, 481 (4) (b) (831 SE2d 755) (2019). Here, the record indicates Nabors was made aware of his

16

right to testify in his own defense by both his trial counsel and the trial court and made the decision not to testify himself. As such, we cannot say that Nabors's counsel performed deficiently. Accordingly, Nabors's ineffective assistance of counsel argument fails.

2. Nabors contends that the State failed to prove guilt beyond a reasonable doubt because his convictions were based exclusively on accomplice testimony, and thus, legally insufficient under OCGA § 24-14-8. This contention is meritless.

From the outset, we note the record does not support Nabors's framing of this enumeration of error, because we cannot say these verdicts were "based exclusively" on accomplice testimony. The testimony of Mathis and White may have been key evidence of Nabors's guilt, but additional evidence was also presented from other sources, including the testimony of the eyewitnesses from the gas station; the phone call logs and cell site location data from Nabors's and Mathis's phones; Nabors's flight from the scene; and Nabors's acquisition of a new phone just after the shooting.

In any event, Nabors's enumeration of error contends that

17

Mathis and White were accomplices to the murder and that the evidence was legally insufficient to corroborate their testimony under OCGA § 24-14-8. Assuming without deciding that Mathis and White were accomplices to Milan's murder, the evidence of corroboration was sufficient under OCGA § 24-14-8, and Nabors's contention fails.[8]

Pursuant to OCGA § 24-14-8:

> The testimony of a single witness is generally sufficient to establish a fact. However, in certain cases, including prosecutions for treason, prosecutions for perjury, and felony cases where the only witness is an accomplice, the testimony of a single witness shall not be sufficient. Nevertheless, corroborating circumstances may dispense with the necessity for the testimony of a second witness, except in prosecutions for treason.

See *Doyle v. State*, 307 Ga. 609, 611 (1) (837 SE2d 833) (2020) ("Georgia law requires corroboration in felony cases where the only witness testifying to the defendant's participation in the crime is an accomplice.") (citing OCGA § 24-14-8). Corroborating evidence "may

---

[8] Nabors does not claim the evidence was insufficient as a matter of due process and agrees that the trial court properly instructed the jury on the requirement of accomplice corroboration.

18

be circumstantial, slight, and need not be of itself sufficient to warrant a conviction of the crime charged." *Head v. State*, 316 Ga. 406, 411 (2) (888 SE2d 473) (2023) (citation omitted). Moreover, it is well settled that the testimony of one accomplice can corroborate the testimony of another. *Jackson v. State*, 314 Ga. 751, 755 (1) (879 SE2d 410) (2022). See also *Sams v. State*, 314 Ga. 306, 312 (2) (b) (875 SE2d 757) (2022) (concluding that testimony from one accomplice was sufficient to corroborate the testimony of another when both saw defendant at the scene with a gun, both heard gunshots, and both saw appellant leave the scene after the shots).

Mathis and White sufficiently corroborated each other's testimony implicating Nabors in Milan's murder. Both testified that Nabors was in the Monte Carlo with them on the morning in question, that Nabors became upset with Milan, and that Nabors accused Milan of stealing money from him. Both testified that Nabors's accusation escalated into an argument between Nabors and Milan, that Milan grabbed the steering wheel and pulled the vehicle off the road, and that a fight broke out between Nabors and

19

Milan either inside or just outside of the vehicle. Both testified to Nabors having a gun, to hearing gunshots as they ran away, to Nabors being the shooter, and to Nabors running into the woods after the shooting. Mathis's testimony and White's testimony was consistent, such that White provided sufficient corroboration for Mathis's testimony, and Mathis provided sufficient corroboration for White's testimony under OCGA § 24-14-8. *Jackson,* 314 Ga. at 755 (1). Moreover, the testimony of the eyewitnesses at the gas station, along with the phone call logs and cell site location data, and Nabors's flight from the scene, offer further corroboration of this testimony and support the verdict. Accordingly, Nabors's contention fails.

*Judgment affirmed. All the Justices concur.*

Decided October 15, 2024.

Murder. Fulton Superior Court. Before Judge Adams.

*Brian V. Patterson*, for appellant.

*Fani T. Willis, District Attorney, Kevin C. Armstrong, Aslean Z. Eaglin, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Meghan H. Hill, Clint C. Malcolm, Senior Assistant Attorneys General, Sarah J. Thomas, Assistant Attorney General*, for appellee.