NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: May 3, 2022

S22A0317.  BUTLER v. THE STATE.

WARREN, Justice.

After a bench trial that was held in March 2013, Cory Frayana Butler was convicted of malice murder and other crimes for his involvement in a home invasion and beatings that resulted in the death of Epsie Ewing ("Mrs. Ewing") and injury of her husband, C.F. Ewing ("Mr. Ewing").[1]  Butler raises four claims of error on appeal:

---

[1] Mr. and Mrs. Ewing were beaten on May 21, 2009, and Mrs. Ewing died on June 23, 2009.  On August 21, 2009, a Walton County grand jury indicted Butler for malice murder, three counts of felony murder, one count of aggravated battery, two counts of aggravated assault, two counts of false imprisonment, one count of armed robbery, one count of burglary, two counts of possession of a firearm during the commission of a felony, and one count of possession of a firearm by a convicted felon.  The armed robbery and burglary counts and one each of the aggravated assault, false imprisonment, and possession of a firearm during the commission of a felony counts were specific to crimes committed against Mr. Ewing.  The State initially filed a notice of intent to seek the death penalty, but after negotiations with Butler, entered into a consent agreement whereby Butler agreed to a bench trial and the State agreed to withdraw its notice of intent.  After a bench trial from March 13 to

that (1) the evidence presented at trial was insufficient to support his conviction for malice murder; (2) the trial court did not determine whether Butler knowingly and intelligently waived his right to a jury trial; (3) Butler received constitutionally ineffective assistance of counsel; and (4) the trial court committed a sentencing error. For the reasons explained below, we affirm.

---

18, 2013, the trial court found Butler guilty on all counts. On March 26, 2013, the trial court sentenced Butler to life in prison without the possibility of parole for malice murder, ten concurrent years in prison for one of the false-imprisonment convictions, a concurrent sentence of life with the possibility of parole for armed robbery, five consecutive years in prison for one of the convictions for possession of a firearm during the commission of a felony, ten consecutive years in prison for the other false-imprisonment conviction, five consecutive years in prison for the other conviction for possession of a firearm during the commission of a felony, and five consecutive years in prison for possession of a firearm by a convicted felon. The trial court merged, for sentencing purposes, the aggravated battery count and one of the aggravated assault counts into the malice murder conviction, and the other aggravated assault count and the burglary count into the armed robbery conviction. The State has not challenged the purported merger of the burglary count into the armed robbery conviction, and we decline to address that issue sua sponte. See *Dixon v. State*, 302 Ga. 691, 696-698 (808 SE2d 696) (2017). And although the court also purported to merge the three felony murder counts into the malice murder conviction, those counts were actually vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 372 (434 SE2d 479) (1993). Butler filed, through trial counsel, a timely motion for new trial on April 24, 2013, which he later amended. On May 13, 2019, after a hearing on Butler's motion for new trial, the trial court denied Butler's motion as amended. On June 10, 2019, Butler filed a timely notice of appeal, which he later amended. The case was docketed in this Court to the term beginning in December 2021 and submitted for a decision on the briefs.

1. The evidence presented at Butler's trial showed the following. Angela Jackson and Mr. Ewing had been engaged in an extramarital affair since 1999, and Ewing was informally giving Jackson $50 a month for a child she said was his. Ewing previously had told Jackson to stop coming to his house, but on May 17, 2009, Jackson, Ykescha "Missy" Walton (Jackson's niece), and Butler drove to the Ewings' house so that Jackson could "pick up her child support money" from Mr. Ewing.[2] After arriving at the Ewings' house, Jackson sent Butler to the front door to pick up the money. Butler walked up to the door, expressed interest in purchasing Mr. Ewing's red truck, and requested $50 for Jackson. After speaking for a few minutes, Mr. Ewing gave Butler $50 in a money clip, and Butler returned to Walton's car to hand the money to Jackson. Jackson later testified that while driving back from the Ewings' house, Butler made a comment pertaining to how much money Mr. Ewing appeared to have and said "if y'all wouldn't have been in the

_____

[2] Mr. Ewing, Jackson, and Walton all positively identified Butler as the person who accompanied the women to the Ewings' house that day.

3

car, I would have busted his head down to the white meat."

Four days later, on May 21 at around 12:00 or 1:00 p.m., Butler returned to the Ewings' house with J.J. Blackwell and Barry Partee. At trial, Mr. Ewing, who had positively identified Butler, Blackwell, and Partee in photographic lineups, testified as follows. After parking in the Ewings' driveway, Butler and Blackwell exited the car, approached Mr. Ewing, and again expressed interest in purchasing his red truck. Mr. Ewing and Butler then went for a test drive around the block while Blackwell and Partee followed Mr. Ewing's truck in their car. Upon returning to the house, Butler said "don't try nothing [because] I got a gun on you." Butler then exited the truck and began "pistol whipping" Mr. Ewing and beating him on the head with a pistol. Butler "knocked" Mr. Ewing through the back door of the Ewings' house, and Blackwell and Partee followed them inside.

In the utility room, Butler and Blackwell "started beating" Mr. Ewing in the face and head, causing him to fall. Butler also hit Mrs. Ewing, who was standing in the utility room, in the forehead with

4

the pistol.  Blackwell then grabbed Mr. Ewing in a "headlock" and dragged him through the kitchen and into the dining room.  By that point, Butler had moved Mrs. Ewing onto the couch in the dining room.  Mr. Ewing later explained that he assumed that Mrs. Ewing had been beaten with their walking stick, which he saw lying broken on the ground in front of her as she sat screaming on the couch, but that he did not actually see this occur.  Mrs. Ewing said "[h]oney, just give them anything they want," and Mr. Ewing pleaded with "them" to stop hitting his wife.  Then Butler, Blackwell, and Partee left the house through the back door, taking Mr. Ewing's wallet with them.  Before leaving, Butler threatened Mr. Ewing, "if you call the law, I'll come back and kill both of you."  At trial, Mr. Ewing positively identified Butler as one of his attackers.[3]

After Butler, Blackwell, and Partee left the Ewings' house,[4]

---

[3] After Mr. Ewing testified that Butler "might have had" a beard on the day of the attack, he conceded on cross-examination that on the day of the crimes, he told an investigator that none of the assailants had facial hair.

[4] A neighbor saw two men leave the back door of the Ewings' house and enter a car with a third person at around 12:30 p.m. that day.  That neighbor

Mrs. Ewing was "bleeding all over, her face and hands, her head." The Ewings' walking stick was broken and was lying on the floor next to the couch. At Mr. Ewing's request, a neighbor called 911. A few minutes later, police officers arrived and found both Mr. and Mrs. Ewing "covered in blood."

Mrs. Ewing was flown to the Atlanta Medical Center, where she was admitted in critical condition and in a coma. A physical exam and CT scans were performed and showed that she had large cuts on her scalp, fractured facial bones, swelling and bruises on her face, and fractures in both arms. She died on June 23. After performing an autopsy, Dr. Lora Darrisaw of the Georgia Bureau of Investigation ("GBI"), who testified at trial, determined that the cause of death was multiple-system organ failure due to "poor circulation [and] poor oxygenation" following the "blunt force

---

identified Butler in a photographic lineup as one of the men she saw, and she also made an in-court identification of Butler at trial. On cross-examination, she testified that she did not see facial hair on the man she later identified as Butler. A passerby testified at trial that he saw three men leaving the Ewings' house and that one of them appeared to be shoving a gun in his pocket, but he was unable to identify Butler in a photographic lineup.

traumatic injuries" that were inflicted on Mrs. Ewing on May 21. Dr. Darrisaw certified the manner of death as homicide. Dr. James Stevens, who treated Mrs. Ewing after the attack, also testified at trial and explained that blunt force trauma caused Mrs. Ewing's death, even though her preexisting conditions of diabetes, hypertension, congestive heart failure, and deep-vein thrombosis likely contributed to it.

Walton testified at trial that after Jackson told her about the events of May 21, Walton asked Butler if he had beaten Mrs. Ewing, and Butler responded that he had not. Butler then asked Walton "did [she] love [her] auntie," referring to Jackson, and "how would you feel if she was dead?" Walton interpreted this to mean that Butler "might do something" to Jackson "like kill her or something" if she talked about the events of May 21 or Butler's alleged involvement. Nevertheless, Walton discussed the matter with a friend, who in turn called the City of Monroe Police Department and told police to speak with Jackson about the matter. An investigation led officers to obtain an arrest warrant and issue a "be on the

7

lookout" ("BOLO") for Butler in connection with the home invasion and beatings.

On May 26, a Georgia State Patrol trooper—who was looking for Butler because of the BOLO—recognized Butler and began questioning him. Butler provided a false name and then fled on foot before being apprehended. Butler was arrested, and when a detective interviewed him, he denied any involvement in the Ewings' home invasion and beatings, claiming that "he robs rich people" but that he "doesn't rob poor people." He also stated that a man named Richard Deloatch from Monroe was the culprit. But after the police spent a week searching for Deloatch, they concluded that "there appeared to be no such person."

2. Butler contends that the evidence was insufficient to support his conviction for malice murder because even if there was evidence that he struck Mrs. Ewing over the head once with a pistol, the evidence showed that Blackwell dealt the "fatal blows" to Mrs.

8

Ewing.[5]  He further claims that Mrs. Ewing died weeks after the home invasion and beatings because of preexisting medical conditions that were aggravated by Blackwell's assault.  According to Butler, the State did not present evidence that Butler was a party to Blackwell's conduct, and Blackwell's intent cannot be imputed to Butler as a result.

When evaluating a challenge to the sufficiency of the evidence as a matter of constitutional due process, we view the evidence presented at trial in the light most favorable to the verdicts and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted.  See *Jones v. State*, 304 Ga. 594, 598 (820 SE2d 696) (2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-319 (99 SCt 2781, 61 LE2d 560) (1979)).  We leave to the trier of fact "the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts,"

---

[5] Butler does not challenge the sufficiency of the evidence supporting his other convictions.

9

*Smith v. State*, 308 Ga. 81, 84 (839 SE2d 630) (2020), and we do not "reweigh the evidence," *Ivey v. State*, 305 Ga. 156, 159 (824 SE2d 242) (2019) (citation and punctuation omitted).

As a matter of Georgia statutory law, "[e]very person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime." OCGA § 16-2-20 (a). Conviction as a party to a crime requires proof of a common criminal intent, which a trier of fact may infer from "presence, companionship, and conduct before, during and after the offense." *McGruder v. State*, 303 Ga. 588, 591 (814 SE2d 293) (2018) (citation and punctuation omitted). See also *Felts v. State*, 311 Ga. 547, 552 (858 SE2d 708) (2021). And "all the participants in a plan to rob are criminally responsible for the act of each committed in the execution of the plan and which may be said to be a probable consequence of the unlawful design," *Williams v. State*, 304 Ga. 658, 662 (821 SE2d 351) (2018) (citation and punctuation omitted), a principle we have specifically held applies to murders committed during the commission of "a crime that foreseeably [leads] to

murder"—such as armed robbery—perpetrated by a group that shares a common criminal intent. *Felts*, 311 Ga. at 552. See also *Moore v. State*, 311 Ga. 506, 509 (858 SE2d 676) (2021).

Moreover, "we have long held, in numerous cases, that proximate causation is the test for malice murder." *State v. Jackson*, 287 Ga. 646, 649 (697 SE2d 757) (2010) (collecting cases). See also *Stribling v. State*, 304 Ga. 250, 252-254 (818 SE2d 563) (2018) (applying proximate cause standard in determining that evidence was sufficient to support a malice murder conviction). An injury is the proximate cause of death when "(1) the injury itself constituted the sole proximate cause of the death; or . . . (2) the injury directly and materially contributed to the happening of a subsequent accruing immediate cause of the death; or . . . (3) the injury materially accelerated the death, although proximately occasioned by a pre-existing cause." *Stribling*, 304 Ga. at 253 (citation and punctuation omitted). See also *Clarke v. State*, 292 Ga. 305, 306 (737 SE2d 575) (2013) (evidence that defendant inflicted blunt-force trauma on elderly victim's head sufficiently supported malice

11

murder conviction, despite evidence that other conditions related to the victim's advanced age also contributed to death).

Here, the evidence was sufficient to convict Butler as a matter of constitutional due process and as a matter of Georgia statutory law. Among other things, the evidence introduced at trial included testimony from Mr. Ewing, who survived the home invasion that resulted in the death of his wife, Mrs. Ewing, and who positively identified Butler as one of their assailants. Mr. Ewing testified that he saw Butler pistol-whip Mrs. Ewing on the head. But he also testified that he pleaded with the group of assailants, which he referenced as "them," to stop hitting Mrs. Ewing. And based on that testimony and other evidence presented at trial, the jury was authorized to infer that Butler—whom Mr. Ewing identified from a photographic lineup and at trial as one of the men who attacked Mrs. Ewing and him—attacked Mrs. Ewing beyond the pistol-whip about which Mr. Ewing separately testified. According to Mr. Ewing, the assailants' additional assault against Mrs. Ewing left her beaten and bloodied. Other evidence presented at trial included Butler's

comments to Jackson and Walton days before the home invasion about Mr. Ewing's cash and "bust[ing] his head down to the white meat" if the women were not there; a neighbor's positive identification of Butler as one of the men she saw leaving the Ewings' house around the time that the home invasion and beatings ended; Butler's threat to kill the Ewings as he left their house after the home invasion; Butler's veiled threat against Walton; and Butler's flight from law enforcement.

And although Butler points to Dr. Stevens as supporting Butler's defense theory that he did not cause Mrs. Ewing's death, Dr. Stevens' testimony undermines, rather than supports, Butler's claim. That is because Dr. Stevens testified that it was "likely" that Mrs. Ewing's preexisting medical conditions, "combined" with the blunt force trauma she suffered during the assault, caused her death, thus allowing the trial court, as the trier of fact, to conclude that the injuries from Mrs. Ewing's beating "materially accelerated [her] death," *Jackson*, 287 Ga. at 649, and thus proximately caused it. Specifically, the court heard that Mrs. Ewing was admitted to

the hospital in critical condition after the attack; Dr. Stevens acknowledged Mrs. Ewing's preexisting medical conditions and nonetheless testified that Mrs. Ewing would not have died "on that day" without the blunt force trauma she suffered; and Dr. Darrisaw certified Mrs. Ewing's manner of death as a homicide. In sum, the evidence presented at trial and recounted in part above authorized a rational trier of fact to conclude beyond a reasonable doubt that Butler was guilty of the crime of malice murder for which he was convicted, and that he was at least a party to that crime. See *Jackson*, 443 U.S. at 319. See also OCGA § 16-2-20.

3. Butler contends that his right to a jury trial under the Sixth Amendment to the United States Constitution was violated because the trial court "never questioned [him] to determine whether he knowingly and intelligently waive[d] his right to a jury trial." As explained below, the record belies that argument and this enumeration of error fails.

"When a defendant seeks to waive his or her right to a jury trial, a trial court should ask the defendant sufficient questions on

14

the record so that the court can ensure the defendant's waiver is knowing, voluntary, and intelligent." *Agee v. State*, 311 Ga. 340, 343-344 (857 SE2d 642) (2021) (citation and punctuation omitted). "The constitutional right to a jury trial may be waived only if the State proves beyond a reasonable doubt that a defendant did so knowingly, voluntarily, and intelligently." See id. at 343 (citation omitted). This burden can be met by a "showing on the record that the defendant was cognizant of the right being waived." Id. "We review a trial court's acceptance of a waiver of a constitutional right for clear error." Id. at 344.

Here, the record shows that the State initially sought the death penalty in this case, filing a notice of intent (and later an amended notice) to seek the death penalty. On March 13, 2013, Butler and the State entered into a consent agreement, signed by both parties, whereby the State withdrew its notice of intent to seek the death penalty and Butler waived his right to a jury trial. The consent agreement expressly provided that Butler "does hereby waive trial by jury on the charges in [this] case and consents to be tried by the

15

Court without a jury."

The parties presented the trial court with the consent agreement during a pretrial motions hearing held that same morning. Both the State and Butler's counsel verbally agreed to proceed without a jury. The trial court then asked a series of questions to determine whether Butler "expressly, intelligently and personally participate[d] in the waiver of his right to a jury trial." After affirming that Butler would provide truthful answers to its questions, the trial court had the following exchange with Butler:

> THE COURT: That's good. Now, Mr. Butler, you signed this consent agreement between the State of Georgia and the accused to proceed under Senate Bill Number 13. It includes, but [is] not limited to, the waiver of the jury trial. Did your attorney explain to you everything that's in this consent agreement?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT Did you understand everything in this consent agreement?
>
> THE DEFENDANT: I mean, I understand according to how they explained it to me, yes.
>
> THE COURT: Well --

16

THE DEFENDANT: Yes, sir.

THE COURT: Okay. So they explained everything to you to the best of their ability . . . about waiving a jury trial. Do you want to waive a jury trial?

THE DEFENDANT: Yes, sir.

THE COURT: And you understand we're here today and we have jurors back there ready to be picked to have a jury trial in this matter? Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: And if you want a jury trial, it's your constitutional right to have a jury trial?

THE DEFENDANT: Yes, sir.

THE COURT: But if you want to consent to not have a jury trial, if you do that, expressly, intelligently and personally make a decision not to have a jury trial, then you have that right also?

THE DEFENDANT: Yes, sir.

THE COURT: Do you want to waive a jury trial and proceed without a jury here today?

THE DEFENDANT: Yes, sir.

THE COURT: And that's after your attorneys have explained to you all the ramifications, the benefits and drawbacks of waiving a jury trial; is that correct?

17

THE DEFENDANT: They explained to me, I guess, it would be in my best interest to waive the jury trial and proceed with a bench trial.

THE COURT: All right. And after listening to them, do you feel like it's in your best interest to proceed without a jury trial?

THE DEFENDANT: Yes, sir.

THE COURT: All right. I find that the defendant has expressly, intelligently and personally participated in the waiver of his jury trial.

Later that afternoon, immediately prior to the start of the bench trial, Butler's attorney stated that "Mr. Butler just wanted me to put on the record that he is absolutely on board" with a bench trial. Butler again confirmed on the record that he agreed.

Contrary to Butler's claim on appeal, the record shows that the trial court repeatedly inquired about whether Butler had been informed about and understood his right to a jury trial and that he was choosing to waive it, that Butler stated he did so because he believed it was in his best interest, and that both the trial court and Butler confirmed that Butler wanted a bench trial. The trial court did not err, let alone clearly err, by finding that Butler had

18

"knowingly, voluntarily, and intelligently" waived his right to a jury trial. See *Agee*, 311 Ga. at 344-345.

4. Butler contends that his trial counsel provided ineffective assistance under the Sixth Amendment to the United States Constitution. But for the reasons explained below, his claims fail.

To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was deficient and that the deficient performance resulted in prejudice to the defendant. See *Strickland v. Washington*, 466 U.S. 668, 687-695 (104 SCt 2052, 80 LE2d 674) (1984); *Wesley v. State*, 286 Ga. 355, 356 (689 SE2d 280) (2010). To satisfy the deficiency prong, a defendant must demonstrate that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (745 SE2d 637) (2013); see also *Strickland*, 466 U.S. at 687-688. Moreover, "[t]rial counsel's decisions relating to strategy and tactics are not judged by hindsight." *Jones v. State*, 296 Ga. 561, 567 (769 SE2d 307) (2015). To satisfy the prejudice

19

prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different. See *Strickland*, 466 U.S. at 694. "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Lawrence v. State*, 286 Ga. 533, 533-534 (690 SE2d 801) (2010).

(a) Butler contends that he waived his right to a jury trial in part because of his trial counsel's belief that co-defendant Partee was going to testify against Butler, and implies that his trial counsel performed deficiently because one predicate for counsel's advice to agree to a bench trial—that Partee was going to testify—did not materialize. Specifically, when Partee was called to testify at Butler's trial, Partee testified that he felt "pressured" to plead guilty, that what he had agreed to testify about as part of his plea agreement "wasn't true," and that he wanted a jury trial in his case instead of pleading guilty. As a result, the trial court excused Partee from the witness stand and the State called its next witness.

To the extent Butler argues that his trial counsel was deficient for advising him to waive his right to a jury trial, the reasonableness of strategic decisions of counsel—in this case, whether to advise his client to waive his right to a jury trial—are to be "examined from counsel's perspective at the time of trial and under the particular circumstances of the case." *Taylor v. State*, 312 Ga. 1, 15 (860 SE2d 470) (2021) (citation and punctuation omitted). See also *Ford v. Tate*, 307 Ga. 383, 422 (835 SE2d 198) (2019). And here, the record shows that there were multiple strategic reasons that could have supported counsel's advice to choose a bench trial. To begin, trial counsel testified at the motion for new trial hearing that at the time he advised Butler to enter the consent agreement with the State to hold a bench trial, Partee had agreed to testify against Butler as a part of Partee's plea deal and counsel did not want a jury to hear Partee's testimony. But counsel also testified that one of his primary objectives in negotiating with the State was to convince the State to withdraw its notice of intent to seek the death penalty, which it did when Butler entered into the consent agreement and

agreed to have a bench trial instead of a jury trial. Moreover, in testifying about why he advised Butler to waive his right to a jury trial, trial counsel also affirmed that Butler's "overall demeanor" caused counsel some "trepidation" about "the impression [ ] Butler would make to a jury." Especially considering that "[t]rial counsel's decisions relating to strategy and tactics are not judged by hindsight," *Jones*, 296 Ga. at 567, we cannot say that any of these reasons were "objectively unreasonable . . . considering all the circumstances and in the light of prevailing professional norms." *Romer*, 293 Ga. at 344; *Strickland*, 466 U.S. at 687-688. Trial counsel's performance therefore was not deficient.

(b) In a related argument, Butler contends that his trial counsel performed deficiently by failing to call Partee as a witness after Partee's recantation. Butler characterizes not calling Partee as a witness as a failure to "present potentially exculpatory evidence."

To begin, it is well settled that the determination of which witnesses to call is a "matter[ ] of trial strategy and tactics, and such

22

strategic and tactical decisions do not amount to deficient performance unless they are so unreasonable that no competent attorney would have made them under similar circumstances." *Roseboro v. State*, 308 Ga. 428, 437 (841 SE2d 706) (2020) (citation and punctuation omitted). But even if we were to assume, for purposes of argument, that trial counsel's decision not to call Partee to testify was unreasonable, Butler did not call Partee to testify at the motion for new trial hearing or otherwise establish what Partee would have testified about had he been called as a witness at trial. As a result, Butler's claim relies on speculation about what Partee would have testified about after he unexpectedly backed out of his plea deal, and Butler cannot meet his burden of proving that he was prejudiced by the failure to call Partee as a witness. See *Alexander v. State*, Case No. S21G0112, 2022 WL 779597, at *9, __ Ga. __, __ (__ SE2d __) (decided Mar. 15, 2022) ("[W]e routinely conclude that such speculation is insufficient to establish prejudice in a claim of ineffective assistance of counsel."); *Harris v. State*, 304 Ga. 652, 654-655 (821 SE2d 346) (2018) (defendant failed to prove he was

23

prejudiced by counsel's failure to call trial witnesses or elicit certain testimony because defendant did not provide competent evidence of what their testimony would be). Having failed to show any prejudice from counsel's alleged deficiency, this claim of ineffective assistance fails.

(c) Butler also contends that trial counsel performed deficiently "in his presentation of [ ] Butler's defense," specifically by arguing at trial that Butler was falsely identified as being part of the group of men who killed Mrs. Ewing, rather than arguing that Butler was merely present but not a party to the crime of murder because Blackwell (not Butler) dealt the blows that ultimately killed Mrs. Ewing.

"An attorney's decision about which defense to present is a question of trial strategy," and "unless the choice of strategy is objectively unreasonable, such that no competent trial counsel would have pursued such a course, we will not second-guess counsel's decisions in this regard." *Anthony v. State*, 311 Ga. 293, 298 (857 SE2d 682) (2021) (citation and punctuation omitted).

24

Moreover, "[a]n attorney's decision about which defense to present is a question of trial strategy and will generally be considered reasonable if supported by evidence in the record." *Wilson v. State*, Case No. S22A0005, 2022 WL 451560, at *3, __ Ga. __, __ (869 SE2d 384) (decided Feb. 15, 2022). See also *Hendrix v. State*, 298 Ga. 60, 63 (779 SE2d 322) (2015) (holding that trial counsel's election to pursue misidentification over self-defense was objectively reasonable).

Here, the record shows that certain aspects of the evidence presented at trial supported trial counsel's false identification argument. For example, one eyewitness failed to identify Butler from a photographic lineup, and there were apparent discrepancies in some of the witnesses' descriptions of the men who were seen at the Ewings' home on the day of the home invasion and beatings, specifically regarding whether Butler had facial hair—a point on which some witnesses provided inconsistent testimony. Regarding Butler's contention that his trial counsel should have argued mere presence, we note that—as recounted in Division 2—there was

25

strong evidence that Butler was at least a party to the crime of malice murder. In light of the strong evidence presented at Butler's trial, his speculation that a different defense strategy would have been more successful than the one his trial counsel chose is not sufficient to establish that his trial counsel performed deficiently. See *Lanier v. State*, 310 Ga. 520, 525 (852 SE2d 509) (2020) ("The fact that appellate counsel would have pursued the defense in different ways does not render trial counsel ineffective.") (citation and punctuation omitted). Under these circumstances, Butler has not carried his burden of demonstrating that trial counsel's decision to present a defense of false identification was objectively unreasonable. See *Wilson*, 2022 WL 451560, at *3.

5. Butler contends that the trial court erred by purporting to "merge" the felony murder verdicts into the malice murder conviction for sentencing purposes. The State concedes this point, and we agree. But because—as noted in footnote 1—the felony murder verdicts actually were vacated by operation of law, and because the trial court's erroneous nomenclature (i.e., referring to

26

"merging" instead of vacating by operation of law) did not affect Butler's sentence, there is no sentencing error we need to correct. See *Manner v. State*, 302 Ga. 877, 890-891 (808 SE2d 681) (2017).

*Judgment affirmed. All the Justices concur.*