NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: March 7, 2023

S23A0144.  WILLIAMS v. THE STATE.

ELLINGTON, Justice.

A Toombs County jury found Israel Timothy Williams guilty of malice murder and possession of a firearm during the commission of a felony in connection with the shooting death of Brandon Colson.[1] Williams challenges the sufficiency of the evidence, contends his trial counsel was ineffective, and argues that the trial court erred in

---

[1] On November 14, 2019, a Toombs County grand jury indicted Williams and co-defendant Hollis Bryant for felony murder (Count 1), possession of a firearm during the commission of a crime (Counts 2 and 4), malice murder (Count 3), and aggravated assault (Count 5). Bryant pled guilty to felony murder prior to trial. During a trial that began March 29, 2021, the jury found Williams guilty of malice murder, possession of a firearm during the commission of a crime, and aggravated assault and not guilty of felony murder. The court sentenced Williams to life in prison without parole for malice murder and to a consecutive five-year sentence for possession of a firearm during the commission of a crime. The trial court merged the aggravated assault count into the malice murder count at sentencing. Williams filed a motion for a new trial on April 5, 2021. New counsel entered an appearance on April 19, 2021, and filed an amended motion for a new trial on March 31, 2022. After a hearing held on April 21, 2022, the trial court denied the motion for a new trial on July 21, 2022. On August 4, 2022, Williams filed a notice of appeal. The appeal was docketed in this Court to the term beginning in December 2022 and was submitted for a decision on the briefs.

denying his request for a jury instruction on coercion. Because Williams failed to carry his burden of showing reversible error, we affirm his convictions as well as the trial court's order denying his motion for a new trial.

1. Williams contends that, because his co-defendant, Hollis Bryant, gave trial testimony exculpating Williams of the crimes, the evidence was constitutionally and statutorily insufficient to support his convictions by proof of his guilt beyond a reasonable doubt. Bryant testified at trial that he shot and killed Colson and that Williams was merely present when he committed the crime. Bryant, who pleaded guilty to murder prior to Williams's trial, also testified that the murder weapon belonged to him, not Williams. Further, Williams, who testified in his own defense, claimed that he only helped Bryant conceal the murder because Bryant had coerced him into doing so. However, as explained below, the jury was authorized to reject this testimony and find, based upon other direct and circumstantial evidence, that both Williams and Bryant were parties to Colson's murder, and that Williams killed Colson because

2

Colson had quit his job while owing Williams thousands of dollars.

When evaluating a challenge to the sufficiency of the evidence as a matter of federal constitutional due process under *Jackson v. Virginia*, 443 U.S. 307, 318-319 (99 SCt 2781, 61 LE2d 560) (1979), we view the evidence presented at trial in the light most favorable to the verdicts and ask whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Butler v. State*, 313 Ga. 675, 679 (2) (872 SE2d 722) (2022). In so doing, "[w]e leave to the trier of fact the resolution of conflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts, and we do not reweigh the evidence." (Citations and punctuation omitted.) Id. Pursuant to Georgia statutory law, "[t]he testimony of an accomplice must be corroborated to sustain a felony conviction." *Yarn v. State*, 305 Ga. 421, 423 (826 SE2d 1) (2019) (citing OCGA § 24-14-8). Additionally, the jury may find a defendant guilty beyond a reasonable doubt if the evidence shows either that he directly committed the crime or that he was a "party thereto." See OCGA §

16-2-20 (a). A person is a party to the crime if he aids or abets in its commission or if he "advises, encourages, hires, counsels, or procures another" to commit it. Id. at (b) (4). See also *Carter v. State*, 314 Ga. 317, 319 (2) (a) (877 SE2d 170) (2022). And although the defendant's mere presence at the scene is not enough to convict him as a party to the crime, the jury may infer his criminal intent from his "presence, companionship, and conduct before, during, and after the offense." (Citation and punctuation omitted.) *Jones v. State*, 314 Ga. 214, 231-232 (3) (875 SE2d 737) (2022).

Viewed in the light most favorable to the jury's verdicts, the evidence presented at trial showed the following. At the time of his October 4, 2019 death, Colson lived in CKT Mobile Home Park in Lyons, Georgia, which was located behind Truax Veneer Company, where he, Williams, and Bryant worked. The three men knew each other from work and lived near each other. Also, Bryant's cousin was married to Colson. Bryant's wife, Kaleigh Dowd, testified that she and Bryant lived on a large, wooded property in Toombs County a few miles from Colson. Dowd testified that she knew Colson because

4

he had been to their home a few times. She said that Williams and Bryant were much closer to each other than they were to Colson. She testified that Williams and Bryant had matching "GDB" tattoos that meant "Gorillas Don't Bend."

About four weeks before his death, Colson and his stepfather, Shane Powell, went to CKT Mobile Home Park to rent Colson's home. Colson, who had separated from his wife, borrowed the money to rent his home from Williams. Williams, who met them there, engaged Colson in a conversation about hunting. Powell testified that he heard Williams say that he wanted to shoot somebody just to see what it would be like. Powell also heard Williams tell Colson that if they just shot Colson's wife all of his problems would be over. Colson then looked at Williams as if to say "how do you come up with that?" Williams made similar comments to Gabriel Kersey, who worked with him at Truax Veneer and was Colson's next-door neighbor. Kersey testified that Williams asked him and Colson if they had ever seen anyone who had been shot in the head, and when they said "no," Williams replied: "They lay on the ground for a little

while and twitch." On another occasion, Williams told Kersey that he was going to put Colson's "head on a stick and sight [his rifle scope] in on his f***ing head."

Dowd testified that, at about 2:30 p.m. on October 4, as she was getting ready to leave her home to pick up her children from school, Bryant gave her $200. When Dowd asked Bryant where he had gotten the money, he told her not to worry about it and then went back outside. Later that day, as it was getting dark, Dowd saw Bryant walking around outside with Williams. At one point, Williams came inside and asked for water bottles for Bryant and himself, but said nothing else. When Bryant went inside, Dowd noticed that he was dirty, as if he had been doing yardwork. He was also sweaty, pale, clammy, and had a "weird smell" about him. Dowd later came to believe that Bryant and Williams had murdered Colson that day and buried him on the property.

Colson's daughter's birthday was on October 4. When he missed her birthday celebration, Colson's wife called Bryant to ask if he had seen Colson, and Bryant said he had not. On Sunday,

6

October 6, Colson's neighbor, Kersey, sent a text message to Colson's mother, Beverly Powell, stating he believed something was wrong because Colson failed to appear for a planned dinner at his home. After receiving the text, Powell went to her son's home but found it locked. She drove to Williams's home, but no one was there. Powell drove to the Toombs County Sheriff's Department and reported her son missing. Shortly thereafter, an officer with the Lyons Police Department met with Powell, and she gave him the names of some of Colson's friends. After speaking with Powell and doing some preliminary investigation, the officer turned the case over to Detective Andrew Britton.

Detective Britton went to Truax Veneer, where he learned that the last time anyone had seen Colson was on Friday, October 4, when he picked up his paycheck. Colson cashed his paycheck that day around lunchtime. After the detective searched Colson's trailer and saw that the windows were all intact and that nothing appeared broken or out of place, he went to see Williams, who, according to Colson's mother, was likely the last person to have seen her son.

7

Williams told the detective that Colson was having marital problems, was depressed, and quit his job on September 30. Williams said that he last saw Colson between noon and 1:15 p.m. on Friday, October 4. Detective Britton testified that, based on Williams's hesitation and stuttering when answering questions, he suspected that Williams was not being entirely truthful with him, so he asked Williams to come to his office and give him an official statement.

On October 11, Williams gave a recorded statement to Detective Britton. Williams said that he drove Colson on Friday, October 4, to pick up his final check from Truax Veneer and then to the bank to cash it. Thereafter, he and Colson went to get something to eat and "hung out" at Williams's home for a while. Williams said he dropped off Colson at his mobile home at 1:15 p.m. and then he drove back home after seeing Colson go inside. The detective testified that, during the interview, Williams appeared calm.

Colson's neighbor, Kersey, testified that after Colson disappeared, Williams appeared to grow increasingly paranoid and

stressed. Williams confronted Kersey about talking to law enforcement, telling him that he had "better quit running [his] mouth because the streets are talking[.]" Kersey testified that Williams also talked about missing persons reports and wondered how long it takes to find missing people.

After ten days of searching for Colson without success, the Lyons Police Department asked the GBI for help. GBI Agents Craig Pittman and Jason Shoudel assisted in the investigation. Agent Pittman and Detective Britton interviewed Dowd and her friend and co-worker, Miyata Dixon, both of whom later testified at trial. Dowd testified that it was Dixon who first informed her that Colson was missing. Dixon also told Dowd that Williams and Bryant had bragged about "taking care of somebody." Dowd confided in Dixon that she suspected that Williams and Bryant may have buried Colson on her property, based on the way Bryant was acting and how he smelled on the evening of October 4. Dowd later told Dixon that Bryant admitted to her that he and Williams had killed Colson and burned his body. Dixon shared this information with a friend of

hers in law enforcement in a neighboring county, and ultimately with the law enforcement officials investigating Colson's death.

Agents Pittman and Shoudel arrested Bryant and interviewed him at the Toombs County Jail. In his recorded interview, which was played for the jury, Bryant initially claimed that someone named "Low-key" had killed Colson when a drug deal went bad on Dowd's property. However, Bryant eventually admitted that the drug-deal story was a "back-up story" that he and Williams had concocted in the event that they were arrested. Bryant told the agents that Williams had loaned Colson money to rent a mobile home and was upset that Colson had quit his job before paying him back. Bryant admitted that Williams told him that it was "time to do something with [Colson]" and that he went along with it.

Bryant told the agents that Williams's plan was to lure Colson out to the sandpit behind Bryant and Dowd's home and to shoot Colson with Bryant's shotgun, which is what they did. Bryant admitted that, after Colson "got hit in the head," he helped Williams "do whatever" needed to be done. At Williams's direction, Bryant

10

used his lawnmower to cut the grass, obscuring blood and brain matter spattered on the grass, while Williams dug a hole for Colson's body. Bryant said that he owed Williams over $800, and that Williams said he would forgive the debt if Bryant helped him with the clean-up. Williams also took cash from Colson's body and gave $200 of it to Bryant, which Bryant gave to Dowd after they buried the body. Bryant said their first attempt at digging a grave was thwarted by tree roots. So they dug a second grave in another area and dragged Colson there by his feet. It was Williams's idea to start a fire over the grave to burn the body. Later, after concealing the body, Williams went to Bryant's home to smoke cigarettes. They did not talk about the murder.

After interviewing Bryant, the agents arrested Williams. Agents Pittman and Shoudel interviewed Williams after he waived his rights under *Miranda*[2] and agreed to speak with them. According to the agents, Williams appeared relaxed during the interview. In his recorded interview, which was played for the jury, Williams

---

[2] *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

11

admitted that he had loaned Colson over $1000 during the previous six months, but claimed that Colson always paid him back and that he and Colson had no disagreements. Williams said that Bryant had asked him and Colson to "hang out" at his house on October 4, and they played video games for a couple hours before they went into the woods. Williams said he walked ahead of Bryant and Colson, who were walking beside each other. He said he heard a gunshot, turned around, saw Colson on the ground, and then witnessed Bryant shoot Colson "in the face a second time."

Williams maintained that it was Bryant, not him, who had shot and killed Colson, and that all he did was help Bryant bury the body. He further claimed that he did not know if Bryant had a plan to kill Colson, insisting he had just gotten "caught up" in what Bryant had done. He said he helped Bryant and did not call the police because he worried that Bryant would "come for" him or his family. Williams stated that, in the days after the shooting, he returned to Bryant's house and used the murder weapon to do some target practice. When the agents asked Williams if that bothered him, he replied that he

just tried to forget about the shooting. Williams claimed that he returned to Bryant's property because he did not want Bryant to think anything was amiss.

On October 24, agents searched Bryant and Dowd's property for Colson's body. As they searched the wooded area behind the house, they saw a 20-foot-wide area where trees had been felled in a circle, as well as a pile of fallen limbs and trees piled about six feet high. It appeared that some of the trees were cut with a chainsaw, while others were cut with an axe. They also observed what appeared to be freshly disturbed soil and a sandy area where it looked like something had been burned. After removing the trees, the police found a water bottle containing suspected gasoline along with burned tree limbs. When cadaver dogs alerted to the presence of a body, the agents called Agent Matthew Bryan, a GBI forensic expert, to excavate the grave.

Agent Bryan testified that, as he made his way to the victim's grave, he saw a lawnmower in the path as well as an area that looked as if it had been mowed recently. Further down the path he

saw a long, shallow hole where it appeared someone had tried to dig, but there were too many tree roots to dig deeply. Upon locating the suspected grave-site, the agent began his forensic excavation. After removing burned logs, the agent found Colson's body about two and a half feet beneath the surface. Agent Bryan processed the lawnmower blades on November 5, and they tested positive for human blood. Also, during a search of Bryant's home, agents found the shotgun used to shoot Colson, a Remington R70 Express Magnum pump-action shotgun.

A GBI medical examiner performed an autopsy on Colson's body on October 25, 2019. He testified that the front of the skull was collapsed, with "a massive fragmentation" in the center of the face. The medical examiner found birdshot in the head and the hull of a shotgun shell inside the mouth. A second shot cup was found attached to Colson's clothing. The medical examiner opined that the trajectory of the shot was slightly upward and that Colson was shot at close range. Colson's shirt and body were both partially burned.

While incarcerated at the Toombs County Jail, Williams called

his mother and spoke to her about his case. During this recorded call, which was played for the jury, Williams told his mother that he asked his attorney to send "a paper" to Bryant instructing Bryant to say that Williams had nothing to do with the shooting, that Williams had just been in the wrong place at the wrong time, and that Bryant was "in charge." Williams's mother told him to listen to his lawyer and "keep [his] story straight."

At trial, Bryant testified that he alone killed Colson. He said that he told the GBI agents that Williams was responsible because he was afraid and because he and his wife were expecting a child. Bryant testified that, after Williams and Colson got off work, they came over to his house. He said they walked around for a few minutes on his property and that he shot Colson. He testified that Williams did not participate in the shooting, but "was just kind of caught up in the moment."

Williams testified in his own defense. He denied making a comment about shooting Colson's wife, denied saying he wanted to know what it was like to kill someone, denied saying he wanted to

15

sight his rifle on Colson's head, denied bragging about having killed someone, and denied making a statement about someone getting shot in the head and watching them twitch. He also denied shooting Colson or having anything to do with his death, and further denied that he knew Bryant was going to shoot Colson. Williams testified that, although he was present when Bryant shot and killed Colson, his participation was limited to helping conceal the body. He said he did so because he "felt like [he] was part of it" and was afraid Bryant would "do something" to him or his family. He claimed that they went out to the sandpit area behind Bryant's house to shoot at targets and that he was leading the way. He testified that, as they were walking, he heard a gunshot, turned around and saw the victim on the ground, and then saw Bryant shoot the victim a second time. Williams claimed that when Bryant told him to help him dispose of the body, he was "in shock" and did not know what to do, so he just walked over and helped him move the body. Williams said that after he did that, he did not "feel right," so he left.

Williams testified that, later that night, he agreed to return to

Bryant's house to help bury the body to show that he was not going to the police. He said that Bryant told him the body was already burned and that all Williams needed to do was help cover up the grave. Williams said he helped push dirt in the grave. After they were done, Williams said he stayed at Bryant's house for about 30 more minutes and then went home. Williams admitted that, at the time he was interviewed by Detective Britton on October 11, he knew Colson was dead, but did not tell the truth. He admitted that he did not tell law enforcement in his interviews that he was afraid of Bryant or that Bryant had threatened him. He further admitted that he had loaned Colson about $1000, but claimed he had forgiven the debt the same day Colson died. Williams testified that he and Bryant both had "GDB" tattoos because they belonged to the same "clique." Colson was not a member of that clique. Finally, Williams admitted going out with Bryant after the shooting and using the murder weapon to shoot at metal barrels, which Williams described as "playing around."

Williams argues that this evidence was both constitutionally

and statutorily insufficient to support his convictions for malice murder and possession of a firearm during the commission of a crime because it shows that he did not intend to kill Colson and was not a party to the crimes. He relies on Bryant's trial testimony as well as his own testimony to prove that his involvement was limited to helping conceal the murder and that he did so under duress. However, Bryant gave a recorded statement in which he described in detail Williams's involvement in the murder immediately prior to, during, and after the murder, and further testified that the attack on Colson was Williams's idea and motivated by Colson's failure to repay a debt he owed Williams. To the extent Bryant's statement conflicts with his and Williams's trial testimony, any conflicts or inconsistencies were for the jury to resolve, and the jury was entitled to disbelieve Williams's testimony and to reject his defense theory. See *Graves v. State*, 298 Ga. 551, 553 (1) (783 SE2d 891) (2016) ("[I]t is axiomatic that resolving evidentiary conflicts and assessing witness credibility are within the exclusive province of the jury." (citing *Hampton v. State*, 272 Ga. 284, 285 (1) (527 SE2d 872)

18

(2000)).

Further, Bryant's statement to the police was sufficiently corroborated. When the only witness to testify at trial on the issue of the defendant's participation is an accomplice, corroborating evidence is required to support a guilty verdict. See *Edwards v. State*, 299 Ga. 20, 22 (1) (785 SE2d 869) (2016). Whether accomplice testimony has been sufficiently corroborated is a question for the jury, and even slight corroborating evidence of a defendant's participation in a crime is sufficient. See, e.g., *Williams v. State*, 313 Ga. 325, 329 (1) (869 SE2d 389) (2022); *Raines v. State*, 304 Ga. 582, 588 (2) (a) (820 SE2d 679) (2018); *Parks v. State*, 302 Ga. 345, 348 (806 SE2d 529) (2017).

Here, the forensic evidence and the testimony of other witnesses both corroborate Bryant's custodial statement and show that Williams participated in the murder. Dixon testified that Williams and Bryant both bragged about "taking care of somebody." Dowd testified that she saw Williams and Bryant walking around in her yard together on the night Colson disappeared, that Bryant gave

19

her $200, and that Bryant later admitted to her that he and Williams had killed Colson and buried his body on the property. Witnesses testified about Williams's desire to shoot someone in the head, about Williams's desire to shoot Colson's head specifically, and about Williams's paranoia after Colson disappeared. Williams also admitted being present during the murder and acknowledged that Colson had owed him money. The State presented evidence that Williams and Bryant were close friends and that Williams had sent Bryant instructions to testify that Williams was not involved in the killing. And the forensic evidence, including the location of the grave sites and the blood evidence on the lawnmower, was consistent with details from Bryant's custodial statement. Finally, even though Williams testified that the extent of his involvement was to help Bryant conceal the murder because he felt coerced to do so, Williams never told law enforcement that he had been threatened by Bryant to participate in the crimes. Moreover, the jury could infer from testimony about Williams and Bryant spending time together after the murder, "playing around" and doing target practice with the

20

murder weapon, that Williams did not feel coerced.

Thus, despite conflicts in the evidence regarding Williams's particular role in Colson's murder, when viewed in the light most favorable to the jury's verdicts, the evidence was both constitutionally and statutorily sufficient for the jury to find Williams guilty beyond a reasonable doubt as a party to the crimes of malice murder and possession of a firearm during the commission of a felony. See *Jackson*, 443 U. S. at 319 (III) (B); *Eckman v. State*, 274 Ga. 63, 65 (1) (548 SE2d 310) (2001) (concluding that the evidence was sufficient to find that defendant was a party to the crimes where, inter alia, she was present when the crimes were committed, fled the crime scene with her companions, and "used the fruits" of the crimes). See also *Sams v. State*, 314 Ga. 306, 312 (2) (b) (875 SE2d 757) (2022) (holding that testimony of an accomplice, in addition to non-accomplice evidence, was sufficient to corroborate accomplice testimony); *Floyd v. State*, 272 Ga. 65, 66 (1) (525 SE2d 683) (2000) (defendant's own statements served to corroborate accomplice testimony).

2. Williams contends that his trial counsel was ineffective for failing to move for a directed verdict. To prevail on his claim of ineffective assistance of counsel, Williams must show that his counsel's performance was constitutionally deficient and that the deficient performance so prejudiced him that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SC 2052, 80 LE2d 674) (1984). If Williams fails to meet his burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong. See id. at 697 (IV); *Nelson v. State,* 285 Ga. 838, 839 (2) (684 SE2d 613) (2009). In reviewing the trial court's decision, "we accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts." (Citation and punctuation omitted.) *Nelson,* 285 Ga. at 839 (2).

As stated in Division 1, supra, the evidence presented was sufficient to support the jury's guilty verdicts beyond a reasonable

22

doubt. Had counsel made a motion for a directed verdict, it would have been meritless, and failing to file a meritless motion is not deficient performance. See *Keller v. State*, 308 Ga. 492, 499 (2) (c) (842 SE2d 22) (2020) (failing to file a meritless motion to suppress is not deficient performance); *Nelson*, 285 Ga. at 839 (2) ("[C]ounsel's failure to move for a directed verdict presents an insufficient ground as a matter of law for claiming ineffective assistance of counsel."); *Jones v. State*, 278 Ga. 880 (608 SE2d 229) (2005) ("In light of this Court's holding . . . that the evidence adduced at trial satisfied the requirements of *Jackson v. Virginia*, counsel's failure to move for a directed verdict presents an insufficient ground as a matter of law for claiming ineffective assistance of counsel."(citations and punctuation omitted)). Id. Having failed to show that counsel's performance was deficient in this respect, Williams has not carried his burden of demonstrating that his trial counsel was constitutionally ineffective. See *Strickland*, 466 U.S. at 697 (IV); *Nelson*, 285 Ga. at 839 (2).

3. Williams contends that the evidence warranted a jury

instruction on the defense of coercion, given that he testified that he was scared, in shock, and worried about what Bryant would do to him or his family if he did not "go along with" Bryant's crime and help him conceal the body. Given this evidence, Williams contends the trial court committed reversible error in denying his request for a charge on coercion. Pretermitting whether the trial court erred in failing to give the coercion charge, we conclude that any error was harmless.

During trial, the trial court and the parties discussed whether a jury instruction on the defense of coercion should be given. The trial court stated that coercion cannot be a defense to malice murder; indeed, OCGA § 16-3-26 explicitly provides that coercion is not a defense to the crime of murder.[3] See *Frazier v. State*, 309 Ga. 219, 229 (3) (845 SE2d 579) (2020). Williams's counsel agreed, but argued that the defense of coercion could apply to Williams's aggravated

---

[3] "A person is not guilty of a crime, except murder, if the act upon which the supposed criminal liability is based is performed under such coercion that the person reasonably believes that performing the act is the only way to prevent his imminent death or great bodily injury." OCGA § 16-3-26.

assault charge. The trial court reserved ruling until the charge conference, where it revisited the issue. After hearing counsel's arguments, the trial court found that there was no evidence supporting a charge on coercion:

> There's no evidence here of coercion. There's no evidence of a threat. There's no evidence of any violence. There's no evidence that [Bryant] threatened him and made him do it. There's just no evidence of coercion . . . . ["]I thought he might get mad if I didn't help him,["] is not coercion.

Williams then renewed his request for the charge, and the trial court denied it.

As Williams states in his appellate brief, a jury instruction on the defense of coercion, though inapplicable to malice murder, could apply to the "other felonies" for which he was charged.[4] See *Frazier*,

---

[4] In his appellate brief, Williams does not specifically argue that the trial court should have instructed the jury that coercion could be a defense to his felony murder, aggravated assault, or firearms possession charges. Rather, he states that there was "clear evidence that [Williams] was coerced into cooperating, to the extent that he did, with [Bryant]." Williams testified that the extent of his participation in the charged crimes was in helping Bryant conceal Colson's body. Williams, however, was not charged with concealing Colson's death. Also, Williams was acquitted of felony murder and his aggravated assault count merged with his malice murder conviction. This Court generally treats as moot a claim of instructional error that only affects a count that has not resulted in a conviction because of acquittal or merger.

309 Ga. at 229 (3). But, in order to be entitled to the instruction, there must be at least slight evidence supporting a charge on coercion. See *Daly v. Berryhill*, 308 Ga. 831, 833-834 (843 SE2d 870) (2020) ("There need be only slight evidence supporting the theory of the charge to authorize a requested jury instruction."). Pretermitting whether such slight evidence existed warranting an instruction on the defense of coercion, the trial court's failure to give the requested charge was harmless error given that the evidence of Williams's guilt for the crimes of which he was convicted was substantial, and it is therefore highly probable that the failure to

---

See *Williams v. State*, 313 Ga. 325, 332 (4) (869 SE2d 389) (2022) ("Because the jury found [the defendant] guilty of malice murder, the felony murder count was vacated by operation of law, and the aggravated assault that formed the predicate for the felony murder count was merged into the malice murder conviction. Any enumerated error with regard to jury instructions on felony murder or the underlying aggravated assault is therefore moot." (citations omitted)); *Solomon v. State*, 304 Ga. 846, 849 (823 SE2d 265) (2019) ("[T]he aggravated assault merged with the murder, and [the defendant] was not convicted of aggravated assault. Accordingly, his claim of error with respect to the instruction on aggravated assault is moot." (citations omitted)). Further, this Court has expressly reserved the question of whether coercion can be a defense to felony murder. See *Frazier*, 309 Ga. at 229 n.11; *Brooks v. State*, 305 Ga. 600, 605 n.4 (826 SE2d 45) (2019). Thus, the only remaining offense to which the coercion defense arguably might have applied is possession of a firearm during the commission of a crime.

instruct the jury on the defense of coercion did not contribute to the jury's verdicts. See, e.g., *Shah v. State*, 300 Ga. 14, 21 (2) (b) (793 SE2d 81) (2016) ("The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." (citation and punctuation omitted)); *Hamm v. State*, 294 Ga. 791, 797 (2) (756 SE2d 507) (2014) ("The fact that the failure to give the instruction where warranted is error does not, of course, necessarily demand reversal. A conviction in a criminal case will not be reversed when it is highly probable that an erroneous jury instruction did not contribute to the verdict." (citations, punctuation, and footnote omitted)).

Here, the evidence of Williams's guilt, as summarized above, was substantial and compelling. It showed that Williams was, at a minimum, a party to the crimes of murder and possession of a firearm during the commission of a crime. But the State also presented evidence from which the jury could infer that Williams was the shooter. As discussed more fully in Division 1, the forensic evidence and the testimony of a number of other witnesses

27

corroborated Bryant's custodial statement concerning the circumstances of the murder. The evidence showed that Williams was angry with Colson for quitting his job before paying him back and that Williams had expressed his desire to shoot Colson in the head. The evidence also shows that Williams was in control: He paid Bryant to help him clean up the crime scene and dispose of Colson's body and he instructed Bryant to testify that Williams was not involved in the killing. Also, the jury was properly instructed, among other things, on the presumption of innocence, circumstantial evidence, credibility of witnesses, mere presence, parties to a crime, the elements of the crimes charged, and the State's burden to prove every essential element of the charged crimes beyond a reasonable doubt.

Accordingly, we conclude that it is highly probable that the trial court's refusal to instruct the jury on coercion did not contribute to the verdicts. Error, if any, in the trial court's failure to give a charge on coercion was harmless and does not require a new trial. See *Hodges v. State*, 302 Ga. 564, 568 (3) (807 SE2d 856) (2017) (It

was highly probable that the trial court's refusal to charge on coercion did not contribute to the felony murder verdict given the compelling evidence of the defendant's participation in the underlying armed robbery.). See also *Rogers v. State*, 289 Ga. 675, 677-78 (2) (715 SE2d 68) (2011) (no reversible error in failing to give involuntary manslaughter charge where there was overwhelming evidence inconsistent with appellant's version of events but supportive of the jury's finding him guilty of malice murder).

*Judgment affirmed. All the Justices concur.*